**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JOHN FLYNN, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 06-2080 (JMF)** |
| ) | |
| **RECON REFRACTORY** ) | |
| **& CONSTRUCTION, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**PLAINTIFFS' MEMORANDUM REGARDING
THE EMPLOYER WITHDRAWAL LIABILITY ASSESSMENT AGAINST
<u>RECON REFRACTORY & CONSTRUCTION, INC.</u>**

### INTRODUCTION

This is a proceeding under the Multiemployer Pension Plan Amendment Act of 1980 ("MPPAA"), 29 U.S.C. § 1381 *et seq.*, to recover employer withdrawal liability ("EWL") owed to the Plaintiffs, Trustees of the Bricklayers & Trowel Trades Internal Pension Fund ("Fund") by Defendant Recon Refractory & Construction, Inc. ("Recon"). There is no dispute that Recon has "withdrawn" from the Fund within the meaning of MPPAA. The central issue of this arbitration is whether, as Recon contends, the Magistrate Judge should exclude from the EWL calculation contributions that were "required to be made," as set forth in MPPAA. 29 U.S.C. § 1391. Defendant thus seeks to avoid its fair share of the liabilities of the Fund, despite decisions in related proceedings before the National Labor Relations Board ("NLRB") and the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") finding that Recon "intentionally created [a] dispute to avoid its contractual obligations" to the International Union of Bricklayers and Craftworkers ("BAC").[1]

---

[1]   A secondary issue, addressed below, is the amortization of and payment schedule for Recon's EWL. *See infra* at 21-22.

Recon has taken BAC and the Fund on a four-year odyssey of delay and shifting positions. Recon first argued that it was not required to arbitrate its dispute with BAC under their collective bargaining agreement ("CBA"); then it argued to a federal judge in the United States District Court for the Central District of California that the matter did not belong in district court, but before the NLRB; when it lost before the NLRB, it appealed to the Ninth Circuit, where it again lost; back in the district court where the proceeding started, Recon argued that the matter should have been resolved pursuant to the grievance and arbitration procedures set forth in the CBA. Recon now asks the Magistrate Judge, acting as arbitrator under MPPAA, to allow it to benefit from its own wrongdoing by calculating its EWL as if it had *never violated the CBA* – contrary to the determinations of the NLRB and the Ninth Circuit.

The Fund has calculated Recon's EWL by including the hours that would have been worked by members of BAC "but for" Recon's violation of the CBA. The Fund's calculation complies with the express language of 29 U.S.C. § 1391, obligating a plan to assess EWL based on the "contributions *required to be made* under the plan by the employer." (emphasis added). The Fund's EWL determination is "presumed correct unless [Recon] shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." 29 U.S.C. § 1401 (a)(3)(A). Recon cannot meet that burden.

## Procedural and Factual History[2]

### A.    Recon Violates and then Terminates the CBA

The Fund is a multiemployer pension plan subject to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, and governed by an equal number of employer-appointed and union-appointed trustees. The Fund provides pension benefits to

---

[2] Most of the facts set forth below are contained in the decisions of the NLRB and Ninth Circuit. *See* July 24, 2003 Decision and Order Quashing Notice of Hearing, 339 N.L.R.B. 825 (2003) and *Recon Refractory & Construction Inc. v. NLRB*, 424 F.3d 980 (9th Cir. 2005), attached hereto as Exhibits 1 and 2, respectively.

DSMDB-2274316v03

participants who have worked under BAC labor contracts.  Those pensions are funded by contributions from participating employers.

Recon is a California construction industry employer that performs installation of refractory materials.  Recon was party to a CBA with BAC called the National Refractory Agreement ("NRA").  The NRA required Recon to assign all refractory work (as defined in the agreement) to BAC bricklayers, and to make pension benefit contributions to the Fund on account of this work.

For a decade, Recon assigned its refractory work to BAC members, and made contributions to the Fund based upon the hours worked.  In 1999, "Recon commenced attempts to gain contractual wage concessions for refractory work from [BAC]" and it "gave the required notice of intent to terminate the NRA."  *See* July 24, 2003 Decision and Order Quashing Notice of Hearing, 339 N.L.R.B. 825, 826 (2003) ("NLRB Decision"), attached hereto as Exhibit 1. Eventually, Recon decided to execute an amended CBA with BAC, on December 20, 1999.  Like the prior NRA, this CBA also required Recon to assign to BAC members all refractory work that had been historically or traditionally assigned to BAC members and to make pension benefit contributions to the Fund for all such work.  Around this same time, Recon began to violate the terms of its agreement with BAC by performing refractory work using members of a different union – the Industrial, Professional, and Technical Workers Internal Union ("IPTW") – pursuant to the plan of Recon's owner, Dan Bellamy, to "stick it to [BAC] . . . because . . . they [would] not help Recon out by taking a freeze on the wages":

> In January 2000, however, the Bricklayers discovered that Recon was performing nonbrick refractory installation work – the work in dispute – at [a] job site with non-Bricklayer employees, without informing [BAC's local affiliate] as the NRA required.  This was the first time since Recon's founding that employees other than Bricklayers had performed this type of refractory work.

DSMDB-2274316v03

*Recon Refractory & Construction Inc. v. NLRB*, 424 F.3d 980, 883- 84 (9th Cir. 2005) ("Ninth Circuit Decision"), attached hereto as Exhibit 2.  Recon ultimately terminated its relationship with BAC in 2005, but continued to perform covered refractory work within the jurisdiction of its collective bargaining agreement with BAC using non-covered employees.  This constituted a "withdrawal" from the Fund within the meaning of MPPAA.[3]

### B.      Recon's Litigation with BAC

Recon's transfer of refractory work from BAC to IPTW precipitated litigation that now has lasted more than seven years.  Initially, BAC's local affiliate in Los Angeles, California, Local 4, sought to grieve the dispute under the CBA, but Recon contended that the dispute was not subject to the CBA's procedures.  On June 21, 2000, BAC filed a complaint in the United States District Court for the Central District of California seeking damages for breach of contract under 29 U.S.C. §185(a).  Recon thereafter filed NLRB charges against BAC on August 4, 2000, arguing that it was caught in the middle of a jurisdictional dispute between BAC and IPTW, and that an injunction should issue.  BAC and Local 4 filed counter-charges against Recon with the NLRB.  Recon then argued to the district court judge in California that the matter did not belong in federal court, but rather before the NLRB.  As Recon requested, the district court stayed the contract action on September 13, 2000, pending the NLRB proceedings, but issued an order (attached hereto as Exhibit 3) directing the parties not to destroy relevant documents in the interim.

Following an extensive 18-day hearing, the NLRB issued a July 24, 2003 Order finding that the dispute before it was not a jurisdictional dispute between BAC and IPTW, but rather "a contractual dispute" that was "created" by Recon when it transferred refractory work

---

[3]  *See* 29 U.S.C. §1383(b)(2) (A construction industry employer withdraws when it ceases to have an obligation to contribute under the plan and either continues to perform previously covered work in the same jurisdiction or resumes such work within five years without renewing its obligation to contribute.).

DSMDB-2274316v03

from BAC to IPTW. *See* NLRB Decision, 339 N.L.R.B. at 828, attached hereto as Exhibit 1. Recon appealed the NLRB's decision. On appeal, the Ninth Circuit rejected Recon's arguments and affirmed the Board's decision that "Recon itself precipitated the dispute in an attempt to avoid its obligations to [BAC]." Ninth Circuit Decision, 424 F.3d at 982, attached hereto as Exhibit 2.

In 2006, after the Ninth Circuit's ruling, BAC came back to the district court, seeking to finally pursue its claim for damages resulting from Recon's breach of the CBA. Recon responded by moving to dismiss based on BAC's failure to exhaust its contractual grievance and arbitration remedies under the NRA, supporting its motion by arguing that the NLRB and Ninth Circuit decisions were "collateral estoppel." *See* June 22, 2006 Supplemental Memorandum of Points and Authorities ("Supp. Mem.") at 6, attached hereto as Exhibit 4; *see infra* at 17-19. The court granted Recon's motion to dismiss without prejudice, sending the parties to arbitration. In that arbitration, Recon is arguing that BAC is barred from pursuing its damage claim because it failed to exhaust the grievance procedure in a timely manner. The arbitration proceeding is still pending.

### C.    The Fund Could Not Complete an EWL Audit Because the Pertinent Recon Records Did Not Exist or Were Destroyed

The Fund is entitled to audit employers to determine if they have been contributing to the Fund consistent with their collective bargaining agreements. *See, e.g., Central States v. Central Transport*, 472 U.S. 559, 574 (1985). These audits can occur even after an employer has terminated its CBA, to examine the period during which the contract was in effect. The auditor retained by the Fund reviews the job classifications of employees and the employer's payroll records to determine if the employer complied with the CBA.[4]

---

[4]    BAC is seeking from Recon both wages and contributions owed to the Fund under the CBA. BAC sought to join the Fund as a party to the California litigation so that the Fund could seek recovery in its

DSMDB-2274316v03

In 2004, the Fund attempted to conduct such an audit of Recon, through an independent auditor, Gus Sand. The NRA provided that Recon was to make contributions to the Fund based on the rates set forth in the local union CBAs in the locales where the work was performed. However, the rates varied, based on locality, so it was necessary for Sand to know the location of each job in order to review the hours worked and multiply the hours worked by the applicable local rate. Upon a review of Recon's books, Sand learned that Recon had not retained records that would show which hours were worked on which jobs. Fund counsel contacted Recon's counsel to inquire about this lack of records and to ask if there were any documents that could provide the location of the work and the identities of the employees performing the work on that job. Fund counsel was informed that time cards were not kept and that hourly job records which would show this information were destroyed after the information was entered into the computer system.[5]

Also, the Fund normally would use Recon's total contributions for the period 2000 through 2004 to make its EWL calculation. *See infra* at 9-10. Because of Defendant's transfer of BAC work to IPTW in violation of the NRA, the Fund did not have any hours or contributions for the years relevant to assessing EWL for a 2005 withdrawal. The Fund's actuary therefore based the EWL assessment on an estimate of the contributions from Recon to the Fund that would have been made "but for" Recon's wrongful transfer of the work to IPTW starting in 1999, consistent with 29 U.S.C. § 1391. Using the method discussed *infra* at 9-10, Recon was assessed EWL liability of $657,153 to be paid over a period of 68 months.

---

own name. The California federal district court denied that motion, but permitted Recon's principals to be joined as defendants individually, as alleged alter egos of Recon.

[5] There are letters and/or evidence supporting each of the Fund's factual statements in this brief. The Fund will submit such evidence if and when any hearing takes place in this matter, absent the Court's request for such evidence earlier.

DSMDB-2274316v03

### D.    The Fund Assesses Recon's EWL Under MPPAA

On October 4, 2006, the Fund sent Recon a notice of assessment of withdrawal liability for $657,153, with a 68-month payment schedule of $11,356.77 per month, with the first payment due on December 4, 2006, plus a final payment of $7,298.29. *See* 29 U.S.C. § 1399 (b)(1)(A). The Fund also sent Recon the calculations supporting the EWL assessment performed by the Fund's actuary.[6]

On December 6, 2006, Fund counsel sent a letter to counsel for Recon notifying Defendant that it had failed to make its first interim payment within 60 days from the notice of assessment, or by December 4, 2006, as required by MPPAA. *See* 29 U.S.C. § 1399(c)(2). Pursuant to 29 U.S.C. § 1399(c)(5), Recon was given 60 days, or until February 5, 2007, to cure its failure to make its initial interim payment. Recon never made its December 2006 payment; nor did it timely tender its January 2007 interim payment. Counsel for Recon sent the Fund a notice demanding arbitration on January 5, 2007, under 29 U.S.C. § 1401(a), 29 C.F.R. Part 4221, and the Fund's Withdrawal Liability Procedures. However, interim payments under MPPAA are due regardless of an employer's request for arbitration. *See infra* at 10-12.

In order to collect its overdue interim payments, Plaintiffs moved for a preliminary injunction compelling Recon to comply with the Fund's payment schedule. It also sought interest, liquidated damages, and attorney's fees permitted under 29 U.S.C. §§ 1145, 1132(g)(2), and 1401(d). Subsequently, in exchange for Plaintiffs' agreement to withdraw the preliminary injunction motion, Recon agreed to pay damages and make interim payments equaling $37,582.97. Pursuant to that agreement, Judge Huvelle entered a February 28, 2007 Order requiring Recon to make the agreed-upon payment, in addition to "all future EWL payments in accordance with the schedule set forth in [P]laintiffs' October 4, 2006, letter to Recon, unless

---

[6]    There was a prior notice of EWL assessment and exchange of correspondence relating to the date of withdrawal. The Fund eventually determined that the withdrawal occurred in 2005, not 2003. That exchange is not relevant here.

DSMDB-2274316v03

and until an arbitrator determines that the Fund is not entitled to the assessed EWL." Judge Huvelle's Order also specified that the matter would be referred to a Magistrate Judge, who, at the parties' stipulation, would have the "same powers as an arbitrator enumerated in the [MPPAA], 29 U.S.C. § 1401, to resolve the dispute."

## ARGUMENT

**I.    THE WITHDRAWAL LIABILITY PROVISIONS OF MPPAA WERE INTENDED TO SECURE FUNDING OF PENSION BENEFITS**

### A.    Legislative History

ERISA was enacted in 1974, but the "existing regulatory framework created . . . not only was inadequate to deal with the special problems of multiemployer pension plans, but actually contributed to the financial distress of such plans by creating incentives for employer withdrawals and eventual plan terminations." *Washington Star Co. v. Int'l Typographical Union Negotiated Pension Plan*, 729 F.2d 1502, 1504 (D.C. Cir. 1984). Congress therefore enacted the withdrawal liability provisions of MPPAA in 1980 "to protect the benefit security of participants in multiemployer pension plans and encourage the maintenance and growth of such plans." *Id.* at 1505. The adequate funding of pension plans recently has been of great concern to Congress, resulting in passage of the Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat. 780 (2006).

Withdrawal liability secures "income needed to pay vested beneficiaries" of multiemployer pension plans. *O'Connor v. DeBolt Transfer, Inc.*, 737 F. Supp. 1430, 1435 (W.D. Penn. 1990). Because most multiemployer pension plans are "defined benefit" plans rather than "defined contribution" plans, contributions are not directed to individual accounts for the benefit of specific employees. For example, the Fund provides a set pension amount at a particular age based upon the overall financial health of the Fund. The contributions made for a participant go into the general assets of the Fund, not an earmarked account.

8

Trustees of the Fund have a fiduciary duty to collect EWL. They are responsible for assessing EWL, notifying a withdrawing employer of the amount of liability, providing a schedule for liability payments, and demanding payment in accordance with this schedule. *See* 29 U.S.C. § 1399(b)(1).

## 1.    The Actuary's Calculation of Total EWL

When a participant in a fund performs covered work, his or her service is credited, and the Fund promises to pay future benefits based on that credited service. Benefits for this participant are said to be "vested." MPPAA requires that a withdrawing employer pay a pro rata share of a plan's total liabilities – its unfunded vested benefits ("UVBs"). UVBs consist of the difference between the present value of vested benefits owed by *all* employers under the plan and the value of the plan's assets. An employer's EWL is calculated by taking the total UVBs for the year preceding the withdrawal and multiplying it by a fraction. The numerator of this fraction is the total of the contributions required to be paid by the withdrawing employer for the five years preceding a withdrawal, and the denominator is the total of the contributions made by all participating employers during the same period. *See* 29 U.S.C. §1391, Methods for Computing Withdrawal Liability.

A simple example will illustrate the statutory method of calculating EWL. Employer X withdrew from a multiemployer pension plan in 2005. (1) The total UVBs are $500,000,000 for the plan year ending December 31, 2004; (2) the employer's total contributions equal $100,000 for 2000 through 2004, the five years preceding withdrawal, and; (3) the total contributions for all employers for 2000 through 2004 equal $250,000,000. The withdrawing employer's EWL, or allocable share of the plan's UVBs, is (1) x [(2)/(3)]:  $500,000,000 x [$100,000/$250,000,000] = $200,000. Employer X's EWL is accordingly assessed as $200,000.

DSMDB-2274316v03

### 2. The Actuary Determines an Employer's Required Annual Payment and Interim Payment Schedule

When a multiemployer pension plan makes an assessment of EWL, it also is required by MPPAA to set a payment schedule for an employer. In order to provide an employer with this payment schedule in the assessment letter, it is first necessary to calculate the employer's required annual payment. Pursuant to 29 U.S.C. § 1399(c)(1)(C),[7] the required annual payment of liability is the product of two numbers, derived from examining the ten-year period immediately preceding the plan year when the withdrawal occurred. The first number is an average of the annual number of contribution base units ("CBUs"), or hours worked for which contributions are made, for the three plans years during which the CBUs were highest for the employer. This figure is multiplied by *the highest contribution rate at which the employer had an obligation to contribute on behalf of its employees*. The actuary uses the required annual payment in order to calculate an amortization ratio. This amortization ratio, consisting of the total EWL assessed divided by the required annual payment, produces a number that dictates the duration of the payment schedule and the amount of individual interim payments due.

### B. Arbitration of EWL Does Not Excuse the Obligation to Make Interim Payments

An employer may invoke arbitration to resolve any dispute over the EWL assessed, provided that it does so in a timely manner.[8] The initiation of arbitration does not excuse an

---

[7] 29 U.S.C. §1399 (c)(1)(C) provides that "the amount of each annual payment shall be the product of –

> (I) the average annual number of contribution base units for the period of 3 consecutive plan years, during the period of 10 consecutive plan years ending before the plan year in which the withdrawal occurs, in which the number of contribution base units for which the employer had an obligation to contribute under the plan is the highest, and

> (II) the highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 plan years ending with the plan year in which the withdrawal occurs."

[8] Either party must initiate arbitration within 60 days of the earlier of either the date of a plan sponsor's response to an employer's request for review or 120 days after the date of an employer's request for

DSMDB-2274316v03

employer from meeting its obligations pursuant to a plan's payment schedule: MPPAA provides for a "pay now, dispute later" mechanism, such that that an employer must make all payments as due "until the arbitrator issues a final decision." 29 U.S.C. § 1401(d). This Court has strictly enforced this provision of MPPAA.[9]

Accordingly, unless and until Recon receives an arbitrator's decision to the contrary, the express terms of MPPAA require it to make interim payments to the Fund. Contrary to Defendant's suggestion at the May 16, 2007 status conference, Recon can provide no justification for this Court to modify Judge Huvelle's February 28, 2007 Order requiring Recon to make "payments in accordance with the schedule set forth in [the Fund's] October 4, 2006 [demand] letter . . . unless and until an arbitrator determines that the Fund is not entitled to the assessed EWL." This Order constitutes the agreement reached by the parties in exchange for withdrawing Plaintiffs' application for preliminary injunction.

The Fund's actuary calculated Recon's EWL, its amortization ratio, and its payment schedule, and sent that EWL assessment and payment schedule, attached hereto as Exhibit 5, to Recon on October 4, 2006. An MPPAA arbitrator must "presume that the plan's determinations are correct, unless the employer shows by a preponderance of evidence that a challenged

---

review; parties can jointly initiate arbitration within 180 days after the date of the plan sponsor's EWL demand. 29 U.S.C. § 1401 (a)(1).

[9] *See, e.g., Connors v. Calvert Dev. Co.*, 622 F. Supp. 877, 879 (D.D.C. 1985) (granting a motion to compel interim payments and noting that the courts have "supported unequivocally" an interpretation of MPPAA requiring withdrawal liability payments); *see also Connors v. Brady-Cline Coal Co.*, 668 F. Supp. 5, 7-9 (D.D.C. 1987) (reaching the same conclusion and noting that Congress showed no solicitude for the cash flow problems of employers); *Trustees of the United Mine Workers of America 1974 Pension Plan v. Morrison Knudsen Corp.*, 931 F. Supp. 4, 8 (D.D.C. 1996) (the meaning of the provision is "unambiguous"; the "'pay now, dispute later principle of . . . MPPAA is well established.'") (citation omitted).

DSMDB-2274316v03

determination was 'unreasonable or clearly erroneous.'" *Washington Star Co.*, 729 F.2d at 1505, citing 29 U.S.C. § 1401(a)(3)(A).[10]

## II.    RECON'S EWL MUST BE CALCULATED BASED ON "CONTRIBUTIONS REQUIRED TO BE MADE" – INCLUDING THE HOURS RECON WRONGFULLY DENIED TO THE BRICKLAYER FUND PARTICIPANTS

For purposes of calculating EWL, Recon's hours should include the hours that were wrongfully denied to the participants of the Fund by Recon's violation of the NRA. This conclusion is compelled not only by fairness and justice, but by the clear and precise language of MPPAA.

Section 4211 of MPPAA is entitled "Methods for Computing Withdrawal Liability." 29 U.S.C. § 1391. Paragraph (b) of that section addresses "factors determining computation of unfunded vested benefits allocable to employer withdrawn from plan." *Id.* at § 1391(b). As stated previously, UVBs are calculated by taking the total plan liabilities and multiplying them by the fraction that represents the employer's share. Subparagraph (b)(2)(E) addresses the actuary's determination of that "fraction," the "numerator of which is the sum of the contributions *required to be made under the plan by the employer.*" *Id.* at § 1391 (b)(2)(E)(ii)(I) (emphasis added). Thus, Congress was very clear – it did not say EWL was determined by the hours recorded in the plan's records, but rather, the contributions required to be made under the plan.[11] The hours used in calculating Recon's EWL must include the hours that were wrongfully denied the Fund by Recon's violation of the NRA.

Recon will likely argue that the Magistrate Judge should defer to the arbitration currently pending in California as a result of Recon's motion in the Central District of California

---

[10]  29 U.S.C. § 1401 (a)(3)(A) specifically states that "any determination made by a plan sponsor under sections 1381 through 1399 of this title and section 1405 of this title is presumed correct."

[11]  It is significant, in contrast, that in defining the denominator, the regulations enacted by the Pension Benefit Guaranty Corporation call for the use of contributions reported to the IRS or Department of Labor (hours on the books), not the "required" contributions. 29 C.F.R. 4211.12 (a).

DSMDB-2274316v03

case, and await the California arbitrator's determination of whether and what contributions were "required to be made" under the NRA. There are at least two independent reasons why this argument fails.

First, and most importantly, the responsibility to make the EWL determination lies with the MPPAA arbitrator, and no other tribunal. In enacting MPPAA, Congress was very explicit in providing that the arbitrator, not the court, is statutorily designated to carry out this function. *See* 29 U.S.C. § 1401. ERISA, including MPPAA, is a very precise statute requiring strict compliance with its language. *See e.g., Board of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Illinois Range, Inc.*, 71 F. Supp. 2d 864, 873 (N.D. Ill. 1999) (Courts have "strictly construed MPPAA," recognizing that they "'are bound by the particular rules enacted by Congress and are not free to carve out . . . exceptions merely because [it is] believed[d] that they would best serve Congress' policies and goals,'" thereby "reject[ing] the argument that the broad purposes of ERISA should be looked to at the expense of the *specific statutory language*.") (emphasis added) (internal citation omitted). Thus, the Magistrate Judge, functioning as a MPPAA arbitrator, must determine what contributions were "required to be made."

Second, because the Fund is a legally separate entity from BAC (the international *union*),[12] any determination by the California arbitrator cannot bind the Fund. Recon has argued to, and convinced, the California federal district court that the breach of contract claim by BAC is subject to the grievance and arbitration procedures of the CBA. The Fund, as a third party beneficiary of that contract, is not subject to the grievance and arbitration machinery, and cannot, as a matter of law, be bound by its results. Rather, the Fund is treated like a holder in due course, not subject to defenses that can be used against the union, such as exhaustion of the

---

[12] *See, e.g., National Labor Relations Board v. Amax Coal Co.*, 453 U.S. 322, 332-34 (1981).

DSMDB-2274316v03

grievance procedures.[13]  Thus, even if the arbitrator were to rule that the union cannot recover contributions because it failed to exhaust the grievance machinery, that ruling would be legally irrelevant to the Fund.  Just as importantly, such a ruling would also be legally irrelevant to the determination of what contributions were "required to be made" under the NRA Recon signed. The converse, however, is not true.  With regard to collateral estoppel, Recon can be bound in this proceeding by an adverse determination in another proceeding.  As explained below, Recon is therefore bound by the adverse determinations of the NLRB and the Ninth Circuit.  *See infra* at 15-17.

Therefore, Recon's EWL liability must be resolved in this arbitration.  For five years, Recon has told each tribunal that it should defer to another tribunal, resulting in the day of "judgment" being deferred indefinitely.  It is time for Recon to face some of the consequences of its actions.

## III.   RECON WAS REQUIRED TO MAKE CONTRIBUTIONS UNDER THE PLAIN LANGUAGE OF ERISA, MPPAA, AND THE CBA, AND IS ESTOPPED FROM DENYING THE FINDINGS OF THE NLRB AND NINTH CIRCUIT

### A.    Under the Plain Language Of ERISA, MPPAA, and the CBA, Contributions Were "Required To Be Made" by Recon to the Fund

Section 515 of ERISA provides that: "Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall . . . make such contributions in accordance with the terms and conditions of such plan or such agreement."  29 U.S.C. §1145.  Under the terms of its CBA with BAC and the Fund's Trust Agreement, Recon was obligated to assign to BAC members "all

---

[13]  *See Central States, SE and SW Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148, 1149 (7th Cir. 1987) ("Pension or welfare fund is like a holder in due course in commercial law . . . entitled to enforce the writing without regard to understandings or defenses applicable to the original parties."); *see also New York State Teamsters v. United Parcel Service*, 382 F.3d 272, 280 (2d Cir. 2004) (Fund cannot be barred from collecting delinquent contributions based on defenses that may be available against the union).

14

work which has been historically or traditionally assigned" to BAC members and make contributions to the Fund for this work. Recon failed to make any contributions for these hours because it used IPTW employees to perform this work. Based on the undisputed facts contained in the NLRB and Ninth Circuit decisions, showing that the work Recon assigned to IPTW members had "been historically or traditionally assigned to BAC members," the MPPAA arbitrator should find that the hours used by the Fund to calculate Recon's EWL are correct because they reflect contributions that were "required to be made" under the plan. 29 U.S.C. § 1391 (b)(2)(E)(ii)(I).

### B.     Recon is Collaterally Estopped from Relitigating its Breach of Contract

The doctrine of collateral estoppel, or issue preclusion, provides that an issue of fact or law becomes conclusive in the same or a subsequent action when three requirements are met:

> First, the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case. Second, the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case. Third, preclusion in the second case must not work a basic unfairness to the party bound by the first determination.

*Bryson v. Gere*, 268 F. Supp. 2d 46, 57 (D.D.C. 2003) citing *Yamaha Corp. of America v. U.S.*, 961 F.2d 245, 254 (D.C. Cir. 1992) (internal quotations omitted). Relitigation of an issue with an entity not a party to the proceeding is also precluded "'unless the fact that [the potentially estopped party] lacked full and fair opportunity to litigate the issue in the first action or other circumstances justify affording him an opportunity to relitigate the issue.'" *Id.* at 56 (citation omitted); *see also Allen v. McCurry*, 449 U.S. 90, 94-95 (1980) ("The Court has eliminated the requirement of mutuality in applying collateral estoppel to bar relitigation.").

The question whether Recon transferred refractory work covered by the NRA from BAC members to IPTW members, in violation of the NRA, was necessarily determined in previous proceedings before both the NLRB and the Ninth Circuit. When the NLRB issued its

DSMDB-2274316v03

July 24, 2003 Decision rejecting Recon's claim that a bona fide jurisdictional dispute existed between the unions, it found that the dispute constituted a work preservation claim because Recon had transferred to another union refractory work that had been historically and traditionally performed by BAC members:

> The Board . . . looks to "the real nature and origin of the dispute" in determining whether a jurisdictional dispute exists. Doing so here, we agree with Local 4 that *the real dispute in this case is a contractual dispute* between Local 4 and Recon over the preservation of bargaining unit work . . . . Indeed, bricklayers represented by Local 4 performed the disputed work pursuant to the terms of . . . successive [agreements] for a decade prior to January 2000 . . . . Accordingly, the ensuing dispute over the work involved Local 4's attempts to preserve work traditionally performed by employees it represents under [its CBA].

NLRB Decision, 339 N.L.R.B. at 827-28 (emphasis added), attached hereto as Exhibit 1. The NLRB relied on these findings to hold that the case presented a contractual work preservation dispute, and to dismiss Recon's jurisdictional dispute charges. *Id.* at 828. Thus, the NLRB actually and necessarily determined that the covered work at issue was refractory work that had historically and traditionally been performed by BAC Local 4 members, and that Recon intentionally transferred this work to another union. In light of the language of the CBA requiring Recon to continue to assign to BAC members all work historically or traditionally performed by them, these NLRB findings necessarily mean that Recon breached the NRA.

Recon should be collaterally estopped from disputing these NLRB findings in the present case. There can be no question that the first two requirements of collateral estoppel are met: the issues were hotly contested in an 18-day hearing, and, after extensive post-hearing briefing, submitted for judicial determination and actually and necessarily determined by the NLRB. Indeed, on appeal from the NLRB decision, the Ninth Circuit rejected Recon's argument that the NLRB lacked authority to reach such factual findings, expressly confirming that the NLRB did *in fact* determine the factual issue:

16

> The facts underlying the dispute were clearly before the Board and were a primary subject of inquiry at the hearing; the Board's order quashing notice of hearing was based on those facts. The Board is empowered to make factual findings in the course of determining its own jurisdiction . . . We therefore find no basis for Recon's challenge to the Board's authority to decide such factual questions.

Ninth Circuit Decision, 424 F.3d at 986, attached hereto as Exhibit 2.

Additionally, there is no reason why binding Recon to the NLRB's determination would work basic unfairness; indeed, holding Recon accountable for its intentional and egregious conduct is just and fair. Accordingly, the Fund, though not a party to the NLRB proceeding, may invoke collateral estoppel in this instance. *Bryson*, 268 F. Supp. 2d at 56. For the same reasons, Recon is also collaterally estopped by the Ninth Circuit's affirming decision. The Ninth Circuit held that there was substantial evidence supporting both the NLRB's factual findings that (1) the bricklayers had historically performed the work in dispute; and (2) the dispute was fundamentally of Recon's own making. Ninth Circuit Decision, 424 F.3d at 986-87, attached hereto as Exhibit 2.

Defendant therefore is estopped from relitigating these issues in the present matter because previous related proceedings considered and decided the fundamental issues underlying the Fund's EWL claim against Recon.

### C. Recon is Also Judicially Estopped from Arguing that the NLRB's Findings Do Not Control

The United States Supreme Court has held that the doctrine of judicial estoppel prevents a party from arguing inconsistent positions in legal proceedings:

> A party [that] assumes a certain position in a legal proceeding, and succeeds in maintaining that position . . . may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him . . . . Several factors typically inform [a court's] decision . . . to apply [the judicial estoppel] doctrine in a particular case: First, a party's later position must be "clearly inconsistent" with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position . . . . A third

DSMDB-2274316v03

consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2001).[14]

When Recon appeared in the district court after the Ninth Circuit's decision, it argued that the dispute between the parties was a "work preservation" dispute rather than a "jurisdictional" dispute and that it therefore must be processed through the grievance machinery of the CBA.[15]  In support of this position, Recon cited the NLRB's rulings, stating that "the holding of the NLRB, as affirmed by the Ninth Circuit, is entitled to collateral estoppel effect." *See* Exhibits 1 and 2.[16]  Recon's admission of the collateral estoppel effect of these holdings constitutes acceptance of the necessary factual findings upon which they rest; including the findings that (1) Recon created the contractual dispute by (2) transferring historical and traditional BAC work to another union.  The district court, in granting Defendants' Motion to Dismiss, was persuaded by Recon's collateral estoppel argument.  *See* Sept. 19, 2006 Order Granting Defendants' Motion to Dismiss Plaintiff's First Amended Complaint Without Prejudice at 9 (relying on the fact that "[t]he NLRB and the Ninth Circuit have unambiguously held that

---

[14]  Plaintiffs acknowledge opinions such as *Smith v. District of Columbia*, 295 F. Supp. 2d 53 (D.D.C. 2003) indicating that judicial estoppel is disfavored in this Circuit.  Plaintiffs rely on *New Hampshire v. Maine* in order to demonstrate that the Supreme Court continues to apply the doctrine and approves of its discretionary use.  Because the present case is a paradigm situation for application of the doctrine, Plaintiffs respectfully submit that the Supreme Court's decision must be deemed controlling authority.

[15]  The Fund, unlike BAC, is not required to exhaust the grievance procedures.  *See Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 376 (1984) (holding that "neither the trust agreements nor the collective-bargaining agreements at issue here evidence any intent to condition the contractual rights of trustees to seek judicial enforcement of the trust provisions on exhaustion of the arbitration procedures contained in petitioners' collective bargaining agreements"); *see also Flynn v. Ohio Bldg. Restoration, Inc.*, 260 F. Supp. 2d 156, 168 (D.D.C. 2003) (finding no evidence of "an intent that the Fund relinquish[ed] its express right to institute a civil action, . . . that [it] was aware of the CBA grievance procedure, . . . or that it consented to be bound to its terms.")

[16]  BAC argued to the district court that "jurisdictional" has a different meaning under federal labor law than under the NRA.  The district court accepted Recon's argument.

DSMDB-2274316v03

the cause of the dispute between these parties can only be termed as 'work preservation'"),

attached hereto as Exhibit 6.

Despite prevailing on its argument that the NLRB rulings have collateral effect,

Recon now seeks to dispute these rulings by arguing that it never reassigned work belonging to

BAC members to IPTW members, in violation of the NRA.  This should not be permitted.

Under the Supreme Court's decision in *New Hampshire v. Maine*, 532 U.S. at 749-51,

(1) Recon's position before the California federal district court is "clearly inconsistent" with the

position it is now taking before the Magistrate Judge; (2) Recon "succeeded in persuading [the

California federal district court] to accept [its] earlier position"; and (3) Recon would have an

"unfair advantage" over the Fund if it is not estopped.  Therefore, Recon should be judicially

estopped from maintaining a contrary position in the present proceeding regarding reassignment

of work in violation of the NRA.

**IV.    THE FUND'S EWL CALCULATION IS REASONABLE AND CORRECT**

### A.    Because Recon's Willful Conduct Makes it Impossible to Calculate Damages with Specificity, the Fund is Entitled to Estimate Damages

Recon argues that the Fund lacks both a factual and legal basis for relying on a best

estimate of Defendant's contribution history.  However, it was Recon's wrongful conduct that

compelled the use of an estimate.  Recon cannot defend this arbitration by pointing to the lack of

contribution records when it was the one that failed to maintain or destroyed those records, in

violation of its clear obligations under ERISA.  Indeed, Recon's failure to maintain and preserve

documents not only violated ERISA, it also is contrary to the Order issued by the United States

District Court for the Central District of California specifically warning the parties not to destroy

relevant documents.  *See* September 13, 2000 Order, at 6, attached hereto as Exhibit 3.  Recon

simply cannot be permitted, by its wrongful conduct, to thwart the "strict and detailed collection

DSMDB-2274316v03

and dispute resolution procedures and remedies in MPPAA." *See DeBolt Transfer, Inc.*, 737 F. Supp. at 1434.

Courts have imposed damages on employers that fail in their duty under ERISA to maintain appropriate records and thereby render it impossible to assess liability precisely. Pursuant to 29 U.S.C. § 1059 (a)(1), an employer is required to "maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees." Should an employer either neglect to maintain or destroy such records, it "may not escape liability for benefits due under labor agreements." *See e.g., Trustees of Painters Union Deposit Fund v. Ybarra Construction Co.,* 2004 U.S. App. LEXIS 21696, at *11 (6th Cir. Oct. 14, 2004). In such instances, courts will permit funds to draw inferences that "are reasonable and well grounded in facts." *See Central States v. Kroger Co.*, 2004 U.S. Dist. LEXIS 22059, at *41-42 (N.D. Ill. Nov. 1, 2004) (finding that fund had established "a reasonable basis and methodology" for calculating an estimate of the amount due in unpaid contributions); *see also Zimmerman v. J&S Cos.*, 2005 U.S. Dist. LEXIS 26089, at * 20 (E.D. Mo. Nov. 1, 2005) (permitting a "reasonable estimate of amounts owed" when it was clear employer owed contributions but failed to submit a remittance report for August 2004). This result accords with the longstanding rule of *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931), which permits damages to be estimated when a tortfeasor's conduct prevents exact calculation of the injury inflicted. *See, e.g., Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003) (citing approvingly of *Story Parchment* as the "American rule on damages.")

**B.    The Fund's Estimate of Damages is Reasonable and the Burden is on Recon to Come Forward with Contrary Evidence**

The Fund's estimate of Recon's EWL is reasonable, given Recon's failure to comply with its obligations. In making its estimate, the Fund looked to 1997 and 1998, the two years immediately preceding the commencement of the 1999 transfer of work, for which contributions

DSMDB-2274316v03

were \$72,802.45 and \$85,820.45 respectively, and calculated an average of \$79,311.45 in contributions.[17] This average was used to project contributions over the 2000 through 2004 period, resulting in total contributions equaling \$396,557.25. A similar approach was used for Recon hours: in order to derive a payment schedule, the hours for 1997 (79,135 hours) and 1998 (90,194 hours) were averaged, and the resultant 84,665 hours were assigned to the years 2000 through 2004. The three highest years therefore produced an average of 84,665 hours, a required annual payment of \$135,464, and a 68-month payment schedule.

The burden of proof now rests with Recon to show – through relevant and admissible evidence – that this estimate is unreasonable: "ERISA shifts the burden to the employer to produce evidence of the amount of work performed and to rebut reasonable inferences that can be drawn from the plaintiff's evidence." *Ybarra Construction Co.,* 2004 U.S. App. LEXIS, at *11; *see also Zimmerman*, 2005 U.S. Dist. LEXIS 26089, at *19-20 (on summary judgment, the burden shifts to defendant "to show that Plaintiffs' estimate is wrong and prove the exact amount owed.").

### C. The Fund's Use of the \$1.60 Rate to Calculate Recon's Payment Schedule Strictly Complies with the Statutory Mandate

Recon has advised Fund counsel that it also disputes the amortization of its EWL – its periodic payment schedule. *See supra* at 10. The basis for the objection is that the calculation was made using the highest hourly contribution rate (\$1.60) applicable to any employees working on any Recon jobs. Recon contends that because this rate applied to only a few employees, it should be dismissed as de minimis. At the May 16, 2007 status conference, counsel for Recon stated that Defendant may make an application to the Magistrate Judge for reduction of its periodic payments. Defendant would therefore have the Fund create an

---

[17]    Recon's transfer of work to IPTW had a severe impact on contributions made to the Fund. Contributions for bricklayer refractory work declined as follows: \$10,660.74 (2000); \$8,945.55 (2001); \$1,997.45 (2002); \$3,232.05 (2003); and \$0 (2004).

DSMDB-2274316v03

exception to the formula contained in MPPAA and ask the Magistrate Judge to apply the lower rate of $0.40. Defendant's attempt to alter the required periodic payments should be rejected as MPPAA does not contain any de minimis exceptions for highest contribution rates based on the percentage or number of employees for which the rate applies, nor have any courts read any such exceptions into the provision. Rather, as discussed previously, courts have strictly construed MPPAA. *See supra* at 13. Under such a strict construction, there is no reason to alter the periodic payment schedule communicated to Recon by the Fund.

<b>CONCLUSION</b>

The facts of Recon's breach and withdrawal are undisputed. The EWL was calculated using the contributions "required to be made." Because Recon cannot meet its burden in overcoming Plaintiff's EWL assessment, the Magistrate Judge should order Recon to comply with the Fund's payment schedule.

Respectfully submitted,

Dated: June 29, 2007

By:_____/s/_____
Ira R. Mitzner, DC Bar No. 184564
Charles V. Mehler III, DC Bar No. 475909
Johnisha Matthews, DC Bar No. 492478
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC  20006-5403
(202) 420-2200
(202) 420-2201

*Attorneys for Plaintiffs*

22

EXHIBIT 1

LEXSEE 339 NLRB 825

Industrial, Professional and Technical Workers International Union, SUINA, AFL-CIO and Recon Refractory & Construction, Inc. and International Union of Bricklayers and Allied Craftworkers, Local No. 4 and International Union of Bricklayers and Craftworkers, AFL-CIO.

Cases 21-CD-635 and 21-CD-637

NATIONAL LABOR RELATIONS BOARD

*339 N.L.R.B. 825; 2003 NLRB LEXIS 416; 172 L.R.R.M. 1444; 339 NLRB No. 97*

July 24, 2003

[**1]

DECISION AND ORDER QUASHING NOTICE OF HEARING

By Peter C. Schaumber, Member; Dennis P. Walsh, Member; R. Alexander Acosta, Member

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**OPINION:**
[*825]

This is a proceeding under Section 10(k) of the National Labor Relations Act involving a purported jurisdictional dispute. The charges were filed in Case 21-CD-635 on August 4, 2000, by Recon Refractory & Construction, Inc. (Recon) and in Case 21-CD-637 on November 16, 2000, by Local 4 of the International Union of Bricklayers and Allied Craftworkers (Local 4) alleging that Respondent Industrial, Professional and Technical Workers International Union, SUINA, AFL-CIO (IPTW) violated Section 8(b)(4)(D) of the Act by engaging in proscribed activity with an object of forcing Recon to assign certain work to employees IPTW represents rather than to employees Local 4 represents. The two cases were consolidated, and a hearing was held on February [**2] 6, April 2-6 and 16-20, July 9-13, 17, and 18, 2001, before Hearing Officer Tirza P. Castellanos.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board affirms the hearing officer's rulings, finding them free from prejudicial error. On the entire record, the Board makes the following findings.

I. JURISDICTION

Recon, a California corporation, is a general construction contractor working in areas including, but not limited to, southern California. During the 12-month period ending in July 2001, it purchased and received goods valued in excess of $ 50,000 directly from suppliers located outside the State of California.

The parties stipulated, and we find, that Recon is an employer engaged in commerce within the meaning of Section 2(6) and (7) of the Act and Local 4 and IPTW are labor organizations within the meaning of Section 2(5) of the Act.

II. THE DISPUTE

*A. Background*

Recon's operations include the installation of different types of refractory n1 materials in various industrial units. Recon is party to a collective-bargaining agreement, called the National Refractory Agreement (NRA), with the Interna-

339 N.L.R.B. 825, *; 2003 NLRB LEXIS 416, **;
172 L.R.R.M. 1444; 339 NLRB No. 97

tional Union [**3] of Bricklayers and Craftworkers, AFL-CIO (BAC). n2 Under the NRA, signatory refractory contractors are required to assign refractory work to BAC-represented bricklayers. n3 Pursuant to this agreement, from 1990 through the end of 1999, Recon assigned all of its refractory work in southern California to bricklayers.

> n1 Refractories are heat-resistant materials that are used to line high-temperature furnaces, reactors, and other processing units.

> n2 The NRA is executed by BAC and individual refractory contractors. BAC negotiates the agreement with a management committee of refractory contractors. The NRA's purpose is to provide refractory contractors a means to perform refractory installation work with bricklayers anywhere in the country, without the need to sign separate agreements with BAC locals in each geographic area.

> n3 The NRA's work assignment provision states: "The Employer agrees to assign to employees represented by the BAC all work which has been historically or traditionally assigned to members of the International Union of Bricklayers and Allied Craftworkers, including but not limited to: dipping, setting, buttering, bedding, hanging, pointing, grouting, caulking, cutting, toothing, fitting, plumbing, aligning, laying, leveling, installing of gaskets and expansion joint materials, grinding, vibrating, tamping, guniting, pounding, insulating and spraying of all refractory materials, forming and anchoring for all refractory materials by all means including bolting and welding, ceramic welding, removal and cleaning of masonry materials to be reinstalled, final sandblasting of surfaces to receive refractory materials, installation of chemical coatings, fire-proofing, and membrane materials by any method required, surface spraying of all refractory materials, and cleaning of coke oven walls, chambers and flues."

[**4]

During this same time period, Recon employed laborers to perform support tasks, such as demolition, cleanup, and the mixing and transporting of refractory materials for installation by the bricklayers. n4 In 1996, Recon executed a collective-bargaining agreement with IPTW, covering Recon's laborers working at the facility of U.S. Borax. The IPTW agreement, effective from November 1, 1996, through March 1, 2002, did not expressly define the particular work encompassed by the agreement, and gave Recon unfettered discretion in the assignment of [*826] work. n5 Recon did not assign laborers to perform refractory installation work at any Recon jobsite, including U.S. Borax, at any time prior to 2000.

> n4 Local 4 does not claim this unskilled work, and it is therefore not in dispute in this case.

> n5 The IPTW collective-bargaining agreement's work assignment provision simply states: "Work assignments shall be entirely at the discretion of the Company without regard to seniority or classification."

In the spring of 1999, Recon [**5] customer Arco demanded that Recon cap its labor rates for refractory installation work. As a result, Recon commenced attempts to gain contractual wage concessions for refractory work from Local 4 and its International, BAC. Recon also gave the required notice of intent to terminate the NRA. The Unions rebuffed Recon's wage requests, and the NRA terminated on November 14, 1999. After a brief hiatus, Recon revived its contractual relationship with BAC on December 20 by executing an amended NRA, which included the same work assignment provisions for refractory installation work as in the previous NRA.

Sometime in November, Recon agreed with IPTW to extend the coverage of their extant contract to laborers working on nine additional jobsites, including the Arco site. In late January 2000, n6 Local 4 received information that Recon was performing nonbrick refractory installation work at Arco without informing Local 4, as required under the NRA. Thereafter, Local 4 representatives were denied access to the site. Local 4 filed a grievance alleging that some of the work performed at Arco in January was within the scope of work required to be assigned to bricklayers under the NRA.

> n6 All subsequent dates are 2000, unless otherwise stated.

339 N.L.R.B. 825, *; 2003 NLRB LEXIS 416, **;
172 L.R.R.M. 1444; 339 NLRB No. 97

[**6]

On February 1, Recon's attorney sent a letter to IPTW president, Donna Walsh, enclosing a copy of Local 4's grievance and soliciting IPTW's position regarding Local 4's jurisdictional claim. The next day, Walsh replied that IPTW "claims jurisdiction over the work being performed by Recon's employees at the Arco refinery" and that IPTW would "take immediate economic action against Recon" if the disputed work were re-assigned to bricklayers. In early February, Recon owner, Dan Bellamy, informed Local 4 representatives that Recon was assigning all nonbrick refractory installation work at Arco to IPTW-represented laborers.

On June 21, BAC filed a complaint in Federal court alleging that Recon breached the NRA by assigning non-brick refractory installation work to IPTW-represented employees. On July 31, Bellamy sent a letter to Walsh soliciting IPTW's position if Recon were to reassign the disputed work to the bricklayers. The next day, Walsh responded that IPTW would take "economic action, including picketing," if Recon did so. In response to IPTW's threats, Recon and Local 4 filed 8(b)(4)(D) charges against IPTW.

*B. Work in Dispute*

The work in dispute is the installation of various [**7] types of nonbrick refractory materials. At the hearing, the parties stipulated to the following specific statement of the nature and scope of the work in dispute:

> All refractory work performed by the Employer, including but not limited to the installation of ceramic fiber (sometimes known as Kao Wool), plastics, castables, and spray-on insulation (applied through guniting), including all bolting, welding, grinding, rigging, attaching of anchor studs, ramming, packing, forming, molding, and guniting associated with the installation of these refractories, but excluding the laying of brick, at locations including but not limited to: (1) the Arco Refinery located at 1801 East Sepulveda Boulevard, Carson, California; (2) the Mobil Refinery located at 3700 West 190th Street, Torrance, California; (3) the City of Commerce Refuse-to-Energy project in the City of Commerce; and (4) all future locations in which identical jurisdictional disputes exist.

*C. Contentions of the Parties*

Local 4 moves to quash the notice of hearing, arguing that the dispute here involves a work preservation claim on behalf of Recon's bricklayers whom it represents rather than the kind of jurisdictional dispute [**8] appropriate for resolution through Sections 8(b)(4)(D) and 10(k) of the Act. It argues that Recon created this dispute by assigning the work traditionally performed by the bricklayers to IPTW-represented laborers in violation of the NRA. According to Local 4, Recon is therefore not the "innocent" employer, caught between two rival unions claiming the same work, for whom Congress intended to provide relief under Section 10(k). In the event the Board finds there is a valid jurisdictional dispute, Local 4 alternatively contends that the Board should award the work to the bricklayers represented by Local 4 on the basis of collective-bargaining agreements, employer past practice, area and industry practice, economy and efficiency of operations, and relative skills and training.

Recon and IPTW contend that a bona fide jurisdictional dispute is properly before the Board for resolution. They argue that the Board should award the work to IPTW-represented laborers on the basis of employer preference, relative skills and training, and economy and efficiency of operations. Recon separately argues that employer past practice favors an award to IPTW-represented employees.

*D. Applicability of* [**9] *the Statute*

In determining whether a jurisdictional dispute within the scope of Section 10(k) of the Act exists, the Board [*827] first determines whether there is reasonable cause to believe Section 8(b)(4)(D) has been violated. This requires finding, inter alia, that a union has used proscribed means to enforce its claim to the work in dispute and that it had the proscribed objective of forcing an employer to assign the work to one group of employees rather than to another group of employees. See, e.g., *Stage Employees IATSE Local 39 (Shepard Exposition Services), 337 NLRB No. 119,* slip op. at 3 (2002). Viewed literally, that is what happened in this case. IPTW used means proscribed by Section 8(b)(4)(D) when it threatened to take economic action, including picketing, against Recon, and it did so for the proscribed objective of forcing Recon to assign the work in dispute to the group of employees represented by IPTW rather than the group of employees represented by Local 4.

339 N.L.R.B. 825, \*; 2003 NLRB LEXIS 416, \*\*;
172 L.R.R.M. 1444; 339 NLRB No. 97

However, the Board also looks to "the real nature and origin of the dispute" in determining whether a jurisdictional dispute exists. *Teamsters Local 578 (USCP-Wesco), 280 NLRB 818, 820 (1986),* [\*\*10] affd. sub nom. *USCP-Wesco, Inc. v NLRB, 827 F.2d 581 (9th Cir. 1987).* Doing so here, we agree with Local 4 that the real dispute in this case is a contractual dispute between Local 4 and Recon over the preservation of bargaining unit work for Local 4-represented bricklayers. Such a work preservation dispute is not within the intended scope of Section 10(k) of the Act.

The Board distinguished between such a work preservation dispute and a jurisdictional dispute under Section 10(k) in *Teamsters Local 107 (Safeway Stores), 134 NLRB 1320 (1961),* where Safeway discharged employees represented by one union local, and subsequently reassigned the work they had performed to employees represented by other union locals. The reassignment was in direct violation of the collective-bargaining agreement between the former union and Safeway. The former union picketed in an effort to preserve the contractual work its members traditionally had performed. An unfair labor practice charge was filed, initiating a 10(k) proceeding. The Board concluded that Section 10(k) should not apply because the employer unilaterally created the dispute by [\*\*11] transferring the work away from the only group previously claiming and performing it under a collective-bargaining agreement. Referring to the Supreme Court's direction that the Board must make an affirmative award of the work in dispute when a jurisdictional dispute is properly before it, n7 the Board stated:

> Implicit in this directive is the proposition that Sections 8(b)(4)(D) and 10(k) were designed to resolve competing claims between rival groups of employees, and not to arbitrate disputes between a union and an employer where no such competing claims are involved. Certainly it was not intended that every time an employer elected to reallocate work among his employees or supplant one group of employees with another, a "jurisdictional dispute" exists within the meaning of the cited statutory provisions. n8

> n7 See *NLRB v. Electrical Workers Local 1212 (Columbia Broadcasting), 364 U.S. 573 (1961).*

> n8 *134 NLRB at 1322.*

The Board applied the work preservation [\*\*12] principle again in *USCP-Wesco, supra,* another case involving Safeway. In that case, Safeway reassigned work to a subcontractor in breach of its collective-bargaining agreement with UFCW. After the reassignment, grievances filed by UFCW against Safeway were submitted to arbitration and resolved in its favor. In response, the Teamsters, representing the subcontractor's employees, threatened to picket the subcontractor and Safeway if the work were assigned back to UFCW-represented employees. The subcontractor and the Food Employers Council, on behalf of Safeway, filed 8(b)(4)(D) charges against the Teamsters. Recognizing that "this dispute may literally fall within the terms of Sections 8(b)(4)(D) and 10(k) because there are two competing claims to the work and one of the parties threatened to picket to prevent a change in work assignment," id. at 820, the Board nevertheless found that the real dispute was a matter of work preservation. In quashing the notice of hearing, the Board expressed the view that

> Safeway here is not the "innocent" employer that Section 10(k) was intended to protect. Safeway created this dispute by breaching its collective-bargaining [\*\*13] agreement with UFCW and could have ended it by canceling its subcontract with Wesco. Safeway voluntarily entered into an agreement with UFCW, which included restrictions on subcontracting unit work. Shortly thereafter it nevertheless decided to subcontract unit work to Wesco. Safeway should not now be allowed to use the Board's 10(k) processes to avoid its contractual obligations. [Id. at 823.]

In sum, even though a particular dispute involving competing claims to specific work may literally fall within the terms of Sections 8(b)(4)(D) and 10(k) of the Act, the Board nevertheless will examine the nature and origins of the dispute to determine whether it is actually jurisdictional. Where a dispute is fundamentally one between an employer and a union, and concerns the union's attempt merely to preserve the work it previously had performed, the Board will not afford the employer [\*828] the use of a 10(k) proceeding to resolve a dispute of its own making.

339 N.L.R.B. 825, *; 2003 NLRB LEXIS 416, **;
172 L.R.R.M. 1444; 339 NLRB No. 97

As in the above-referenced cases, the real dispute in this case is a contractual dispute between Local 4 and Recon stemming from Recon's alleged breach of the parties' agreement, and concerns Local 4's consequent efforts to preserve the work [**14] it previously had performed. Indeed, bricklayers represented by Local 4 performed the disputed work pursuant to the terms of the successive NRAs for a decade prior to January 2000. Consequently, when Recon assigned the work in dispute to IPTW-represented laborers at Arco, it was the first time that Recon had failed to assign refractory work in southern California to Local 4-represented bricklayers. Accordingly, the ensuing dispute over the work involved Local 4's attempts to preserve work traditionally performed by employees it represents under the NRA. We conclude, therefore, that the dispute here, created by Recon's alleged breach of its contract with Local 4, is a true work preservation dispute. As such, it is not appropriate for resolution under Section 10(k).

ORDER

It is ordered that the notice of hearing issued in this case is quashed.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Contracts LawThird PartiesDelegation of PerformanceGovernmentsLocal GovernmentsAdministrative BoardsLabor & Employment LawCollective Bargaining & Labor RelationsDiscipline, Layoff & Termination

EXHIBIT 2

LEXSEE 424 F.3D 980

**RECON REFRACTORY & CONSTRUCTION INC., Petitioner, INDUSTRIAL PROFESSIONAL & TECHNICAL WORKERS INTERNATIONAL UNION, SUINA, AFL-CIO, Petitioner-Intervenor, v. NATIONAL LABOR RELATIONS BOARD, Respondent, INTERNATIONAL UNION, International Union of Bricklayers and Allied Craftworkers, and the International Union of Bricklayers and Allied Craftsworkers, Local 4, Respondent-Intervenor.**

No. 03-73064

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

*424 F.3d 980; 2005 U.S. App. LEXIS 19709; 177 L.R.R.M. 3339; 151 Lab. Cas. (CCH) P10,536*

**March 7, 2005, Argued and Submitted, Pasadena, California
September 13, 2005, Filed**

**PRIOR HISTORY:** [**1] On Petition for Review of an Order of the National Labor Relations Board. NLRB Nos. 21-CD-635, 21-CD-637.
*Indus., Prof'l & Tech. Workers Int'l Union, SUINA, 339 N.L.R.B. 825 (2003)*

**COUNSEL:** Steven D. Atkinson, Thomas A. Lenz, and Scott K. Dauscher, Cerritos, California, for the petitioner.

Howard Z. Rosen, Los Angeles, California, for petitioner-intervenor Industrial, Professional and Technical Workers International Union.

Margery E. Lieber, Eric G. Moskowitz, and Corrine E. Yourman, Washington, DC, for the respondent.

Daniel T. Purtell and Jeffrey B. Demain, San Francisco, California, for respondent-intervenor International Union of Bricklayers and Allied Craftworkers, Local 4.

**JUDGES:** Before: Cynthia Holcomb Hall, Kim McLane Wardlaw, and Richard A. Paez, Circuit Judges. Opinion by Judge Paez.

**OPINION BY:** Richard A. Paez

**OPINION**

[*981] PAEZ, Circuit Judge:

We are called upon to resolve a dispute between Recon Refractory & Construction Inc. ("Recon") and the International Union of Bricklayers & Allied Craftwork-

ers, Local 4 ("Bricklayers" or "Local 4"). To decrease its labor costs, Recon reassigned work previously performed by Bricklayers members, and protected by the Bricklayers' [*982] collective bargaining agreement ("CBA"), to employees represented by the Industrial, [**2] Professional and Technical Workers International Union ("IPTW"). The dispute at issue is fundamentally a work-preservation dispute between Recon and the Bricklayers, not an inter-union jurisdictional dispute between the Bricklayers and the IPTW. Because Recon itself precipitated the dispute in an attempt to avoid its obligations to the Bricklayers, we deny Recon's petition for review of the National Labor Relations Board's ("Board") decision quashing notice of hearing under section 10(k) of the National Labor Relations Act ("NLRA"), *29 U.S.C. § 160(k)*. *Indus., Prof'l & Technical Workers Int'l Union (Recon Refractory), 339 N.L.R.B. 618 (2003)*.

I.

1   We derive this statement of facts from the Board's decision and order and from testimony taken at the hearing.

Dan Bellamy founded Recon, a refractory installation company,[2] in 1990. Shortly thereafter, the company signed on to the National Refractory Agreement ("NRA"), the Bricklayers' CBA, with the International [**3] Union of Bricklayers & Allied Craftworkers ("International"). Recon used Local 4 members to perform all refractory work for the next decade. Specifically, pursuant to the explicit terms of the NRA, Local 4 Bricklayers installed not just refractory brick, but "all refractory materials" including ceramic fiber (also known as Kao

424 F.3d 980, *; 2005 U.S. App. LEXIS 19709, **;
177 L.R.R.M. 3339; 151 Lab. Cas. (CCH) P10,536

Wool), plastics, and spray insulation (or gunite). The NRA also included a clause preserving the Bricklayers' right to perform "all work which has been historically or traditionally assigned" to Bricklayers. [3]

2    Refractories are heat-resistant materials that are used to line high-temperature furnaces, reactors, and other processing units. *Recon Refractory, 339 N.L.R.B. at 825 n.1.*

3    The full text of the NRA's work scope provision, which has remained unchanged through each revision and update, provides:

The Employer agrees to assign to employees represented by [the Bricklayers] all work which has been historically or traditionally assigned to members of the International Union of Bricklayers and Allied Craftsmen, including but not limited to: dipping, setting, buttering, bedding, hanging, pointing, grouting, caulking, cutting, toothing, fitting, plumbing, aligning, laying, flagging, leveling, installation of gaskets and expansion joint material, grinding, vibrating, tamping, guniting, insulating, and spraying of all refractory materials, anchoring of all refractory materials by all means including bolting and welding, ceramic welding, removal and cleaning of masonry materials to be reinstalled, final sandblasting of surfaces to receive additional refractory materials, installation of chemical coatings, fire-proofing, and membrane materials by any method required, surface spraying of all refractory materials, and leaning of coke oven walls, chambers and flues. Temporary bracing in coke oven repairs shall be done by employees represented by [the Bricklayers], in coordination with other trades.

NRA Article II § C (1999).

[**4]  In early 1995, the Bricklayers eliminated its class of unskilled members, or "bricklayers' helpers." Recon, however, needed a union to represent those unskilled employees for a job at US Borax Company, which required that its contractors use union labor.

Rather than using more expensive journeyman Bricklayers to do the unskilled work, Recon sought another union. On November 1, 1996, Recon entered into a site-specific "project deal" with the IPTW to provide unskilled laborers who would work with Bricklayers on the US Borax job. The IPTW-represented laborers performed only unskilled support tasks, and did not install brick or non-brick refractory materials. Furthermore, Recon's contract with the IPTW did not include [*983] a thorough work assignment or preservation clause. To the contrary, the IPTW contract simply stated: "Work assignments shall be entirely at the discretion of the Company without regard to seniority or classification." For the first several years of this arrangement, Recon assigned IPTW laborers support tasks, such as demolition, cleanup, and supply of refractory materials to Bricklayers for installation.

Recon's agreement with the IPTW was, as the Bricklayers describe [**5] it, "unusual." Bellamy testified that the company itself "pursued" the union to represent its unskilled laborers. Executives at Recon "made several phone calls, talked to some other contractors that were covered by collective bargaining agreements and eventually ended up with the IPTW." The IPTW-represented laborers were required to join the union and required to sign withdrawal cards to "deactivate" themselves from membership at the end of each job. Recon essentially paid those employees' union dues, increasing their pay to offset the added cost. Through these maneuvers, Recon ensured that its laborers were not represented by any union on any job other than US Borax.

Prompted by its customer Arco Refinery's demand for wage caps, Recon began negotiating with the Bricklayers in 1999 to decrease wage rates. On March 30, 1999, Bellamy requested that the Bricklayers International freeze the $ 0.75 per hour annual wage increase. The Bricklayers would not agree to concessions and would not do the work at the rates Recon proposed. In August, Recon again sought concessions, this time in the form of a 20% wage reduction, which the Bricklayers similarly refused. On August 16, Bellamy notified [**6] the Bricklayers of his intent to terminate the CBA effective November 14, 1999, or "as soon as permitted by law or contract." After negotiations reached an impasse on October 14, Bellamy reaffirmed his intent to terminate the CBA the following month. The NRA expired on November 14, 1999. On December 7, Frank Collins, president of Bricklayers Local 4, notified the union membership that Recon had refused to sign the current NRA and therefore left "no choice but to regard Recon as a non-signatory contractor."

While these negotiations were in process and before the NRA expired, Bellamy mentioned to David Bohannan, who worked with him at Recon, that he wanted to

424 F.3d 980, *; 2005 U.S. App. LEXIS 19709, **;
177 L.R.R.M. 3339; 151 Lab. Cas. (CCH) P10,536

"give somebody else some of the Bricklayers work," and specifically mentioned the work in dispute. [4] "[Bellamy] figured if [the Bricklayers] are not going to give him a freeze he would just go ahead and get somebody else to do the work." Bohannan testified that Bellamy "personally told me he was going to stick it to the International and the Bricklayers especially Frank Collins. . . . because they will not go his way, they will not help Recon out by taking a freeze on the wages." Mauro Romagnoli, a Bricklayers officer, testified [**7] that Bellamy told him that another union was claiming the Bricklayers work. When Romagnoli told Bellamy that would probably force a jurisdictional dispute, "he told me that is where he wanted it to go." "He assured me that this was just the tool to try and force Frank [Collins] and the International to do something in order to meet his demands of a lesser wage or special agreement, whatever he wanted at the time. And he assured me he could break it off at any time[--the] use of these other people to do the Bricklayers work." After the NRA expired in November, Recon expanded the scope of [*984] its agreement with the IPTW to include nine job sites in addition to the US Borax site, including Arco Refinery. [5]

4 Bohannan testified that Bellamy "mentioned Kao Wool, castables, welding and ramming," and used the term "Bricklayers' work."

5 The expanded list of IPTW-covered job sites included the Arco, Ultramar, Tosco, Chevron, Equilon, Mobil, Paramount Petroleum, and Chimco refineries, located mostly in Los Angeles.

[**8] On December 20, 1999, Recon signed a new contract with the Bricklayers, effective retroactively to November 14, 1999, which included the same scope of work provision as the 1990 agreement. In January 2000, however, the Bricklayers discovered that Recon was performing nonbrick refractory installation work--the work in dispute--at the Arco job site with non-Bricklayer employees, [6] without informing Local 4 as the NRA required. This was the first time since Recon's founding that employees other than Bricklayers had performed this type of refractory work. *Recon Refractory, 339 N.L.R.B. at 828.* The Bricklayers filed a grievance on January 28, 2000, alleging that the assignment of work to non-Bricklayers employees violated their contract with Recon.

6 The Bricklayers believed at the time that these employees were non-union, and discovered only later that they were in fact represented by the IPTW.

Recon took the position that the scope of the Bricklayers' work included only refractory brick installation, [**9] and not installation of other refractory materials such as ceramic fiber. On February 1, Recon informed the IPTW of the Bricklayers' grievance and solicited the IPTW's response. The next day, the IPTW formally claimed jurisdiction over the disputed work and threatened "immediate economic action against Recon" should the Bricklayers perform the work. At a meeting on February 4, 2000, Recon informed the Bricklayers that it was assigning all nonbrick refractory installation work at its Arco Refinery job to the IPTW, and only brick work to the Bricklayers. At this meeting, the Bricklayers learned that Recon was signatory with the IPTW at jobs beyond the US Borax site, and that the employees performing the work in dispute were represented by the IPTW. The Bricklayers' representatives at that meeting disputed Recon's interpretation of the NRA's work assignment clause, and asserted their right to the work in dispute.

The Bricklayers filed a complaint in the district court against Recon on June 21, 2000, for breach of the CBA under *29 U.S.C. § 185(a).* [7] When Recon informed the IPTW on July 31, 2000, of the Bricklayers' federal lawsuit, the IPTW again threatened to [**10] "take economic action, including picketing" to preserve its claim to the work should Recon reassign the work to the Bricklayers. The IPTW claimed that Kao Wool installation was the historic work of its union and continued to assert jurisdiction over the disputed work. The IPTW position echoed Recon's: "Bricklaying belongs to the Bricklayers" and all other types of refractory installation materials could be assigned to laborers. As noted above, however, Recon's contract with the IPTW provides only that "work assignments shall be entirely at the discretion of the Company without regard to seniority or classification." Recon has continued to use IPTW-represented employees to perform the disputed work during the pendency of this case.

7 The district court action was stayed on September 13, 2000, pending final resolution of this § 10(k) hearing.

In response to the IPTW's threats of economic action, Recon filed unfair labor practice charges with the Board on August 4, 2000. The Bricklayers filed a similar charge [**11] on November 16, 2000. Both Recon [*985] and the Bricklayers claimed that the IPTW violated § 8(b)(4)(D) of the NLRA, *29 U.S.C. § 158(b)(4)(2)(D)* ("§ 8(b)(4)(D)"), by engaging in proscribed activity with an object of forcing Recon to assign certain work to employees IPTW represents rather than to employees the Bricklayers represent. [8] A hearing officer of the Board heard the evidence summarized above during an eighteen-day hearing pursuant to NLRA §

424 F.3d 980, *; 2005 U.S. App. LEXIS 19709, **;
177 L.R.R.M. 3339; 151 Lab. Cas. (CCH) P10,536

10(k), *29 U.S.C. § 160(k)* ("§ 10(k)"), which allows the Board to resolve jurisdictional disputes by making an award of the disputed work to one or the other of the competing unions. [9] Pursuant to Board procedure, the hearing officer transferred the case directly to the Board for decision. *29 C.F.R. §§ 101.34, 102.90.* On July 24, 2003, the Board granted the Bricklayers' motion to quash notice of hearing. *Recon Refractory, 339 N.L.R.B. at 828.* The Board found that this dispute is not a jurisdictional dispute appropriate for resolution under § 10(k); instead, the dispute was "created by Recon's alleged breach of its contract with Local [**12] 4," and therefore "is a true work preservation dispute." *Id.*

8   In relevant part, § 8(b)(4)(D) of the NLRA provides:

It shall be an unfair labor practice for a labor organization or its agents . . . to threaten, coerce, or restrain any person engaged in commerce . . ., where . . . an object thereof is . . . forcing or requiring any employer to assign particular work to employees in a particular labor organization . . . rather than to employees in another labor organization . . .

*29 U.S.C. § 158(b).*

9   Section 10(k) of the NLRA provides:

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of [§ 8(b)(4)(D)], the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen . . .

*29 U.S.C. § 160(k).*

**II.**

Recon challenges the Board's decision to quash notice of hearing on two grounds. First, it claims that the [**13] Board's factual findings were not supported by substantial evidence. It also objects to the Board's authority to determine that Recon itself created the dispute with the Bricklayers. Second, Recon argues that the Board's legal conclusions are erroneous, and objects to the Board's decision to look beyond the literal violation of §

8(b)(4)(D) to determine "the real nature and origin of the dispute." *Id. at 827* (quotation marks omitted). We have jurisdiction over Recon's appeal from the Board's final order quashing notice of hearing under § 10(f) of the NLRA, *29 U.S.C. § 160(f). Foley-Wismer & Becker v. NLRB (Foley-Wismer I), 682 F.2d 770, 775 (9th Cir. 1982)* (en banc). We reject each of Recon's arguments and affirm the Board's decision.

**A. Substantial Evidence Supports the Board's Factual Findings**

After reviewing the evidence taken at a lengthy evidentiary hearing, the Board concluded that Bricklayers had performed the work in dispute at all times prior to Recon's reassignment in January 2000. *Recon Refractory, 339 N.L.R.B. at 828.* Specifically, the Board found that the Bricklayers' Local 4 members [**14] had

performed the disputed work pursuant to the terms of the successive NRAs for a decade prior to January 2000. Consequently, when Recon assigned the work in dispute to IPTW-represented laborers at Arco, it was the first time that Recon had failed to assign refractory work in southern California to Local 4-represented bricklayers.

[*986] *Id.* The Board also found that the dispute was fundamentally of Recon's own making. *Id.* Recon maintains that there is no evidence to support these findings and that, in any event, the Board was not empowered to make such a determination. We disagree.

We review the Board's findings of fact for substantial evidence. NLRA § 10(e), *29 U.S.C. § 160(e).* Under this standard, we must affirm where the relevant evidence is such that "a reasonable mind might accept [it] as adequate to support a conclusion"--even if it is possible to draw a contrary conclusion from the evidence. *Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001)* ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the [agency]."); *cf. Waterway Terminals Co. v. NLRB, 467 F.2d 1011, 1018-19 (9th Cir. 1972)* [**15] (remanding a decision to quash notice of hearing as not supported by substantial evidence because the Board failed to consider relevant contrary evidence in the record). Reviewing for substantial evidence, we examine the Board's findings "with a deferential eye." *See Alderman v. SEC, 104 F.3d 285, 288 (9th Cir. 1997).*

Although the Board ultimately quashed notice of the hearing, it made that decision after eighteen days of hearings eliciting substantial testimony and documentary

424 F.3d 980, *; 2005 U.S. App. LEXIS 19709, **;
177 L.R.R.M. 3339; 151 Lab. Cas. (CCH) P10,536

evidence. *Recon Refractory, 339 N.L.R.B. at 825*. The facts underlying the dispute were clearly before the Board and were a primary subject of inquiry at the hearing; the Board's order quashing notice of hearing was based on those facts. The Board is empowered to make factual findings in the course of deter-mining its own jurisdiction under §§ *8(b)(4)(D)* and *10(k)* and in determining whether an unfair labor practice has occurred within the meaning of those sections. Section 10(k) in fact explicitly "empower[s] and direct[s]" the Board "to hear and determine the dispute out of which [a charged] unfair labor practice shall have arisen." *29 U.S.C. § 160(k)* [**16] . We therefore find no basis for Recon's challenge to the Board's authority to decide such factual questions.

Furthermore, our review of the record suggests that the evidence was more than sufficient to support the Board's findings. First, substantial evidence supports the finding that Bricklayers had performed the disputed work at all times prior to Recon's reassignment at the Arco job site. [10] Frank Collins, for example, testified that to his knowledge, non-Bricklayer laborers never installed any refractory materials of any kind prior to this dispute. Although Bricklayers field representatives were charged with notifying Collins of changes in work assignments and ensuring that Bricklayers' work was not assigned to other employees, no field representative ever notified him of any such changes before January 2000. Kenneth Golden, a laborer foreman, testified that laborers did not perform installation of brick, ceramic fiber, castables, or any other refractory material. He testified that he did not see laborers performing refractory installation and that those tasks were performed by Bricklayers [*987] exclusively. Romagnoli confirmed these accounts in his testimony.

10    Recon asserts that from the very beginning, the division of labor was clear: "Bricklayers laid refractory brick and IPTW laborers performed all nonbrick installation work." But the only evidence to support the claim that laborers performed the work in dispute prior to 2000 comes from testimony of Recon executives, including Bellamy and Bohannan, which the Board did not credit. In addition, Recon's position is directly contrary to the express terms of the NRA itself, which preserves for Bricklayers the work of "guniting," "ceramic welding," and "spraying of *all refractory materials*" and "installation . . . *by any method required*" (emphasis added).

[**17] Second, the Board's finding that Recon created the dispute is also supported by substantial evidence. As noted above, witnesses testified that Bellamy made his intentions quite clear: he wanted to force a ju-risdictional dispute as a tool to gain wage concessions from the Bricklayers. He acknowledged that he was using IPTW-represented laborers "to do the Bricklayers work." And Bricklayer Paul Garcia testified that he spoke with Bellamy on November 30, 1999, who told him "if I wanted to come back to work that I was going to have to show the laborers how to do the Bricklayers' work." There is significant evidence in the record to support the finding that this dispute was created by Recon's alleged breach of its contract with the Bricklayers. We therefore reject Recon's objections to the Board's factual findings.

**B. The Board's Legal Conclusions Were Not Arbitrary and Capricious**

Based on these findings, the Board found this dispute inappropriate for resolution through a *§ 10(k)* proceeding. *Recon Refractory, 339 N.L.R.B. at 828*. Although viewed literally the IPTW's threats did provide reasonable cause to believe that a violation of *§ 8(b)(4)(D)* had occurred, [**18] the Board found that the *real* nature of the dispute was a contractual one between the Bricklayers and Recon over the preservation of bargaining unit work for the union that had traditionally performed it. *Id. at 827*. Citing the Board's prior decisions in *Steel, Paper House, etc. Local 578 (USCP-Wesco I), 280 N.L.R.B. 818 (1986), aff'd. sub nom. USCP-Wesco, Inc. v. NLRB (USCP-Wesco II), 827 F.2d 581 (9th Cir. 1987)*, and *Teamsters (Ind.) Local 107, Highway Truck Drivers & Helpers (Safeway Stores, Inc.), 134 N.L.R.B. 1320 (1961)*, the Board concluded that

> where a dispute is fundamentally one between an employer and a union, and concerns the union's attempt merely to preserve the work it previously had performed, the Board will not afford the employer the use of a 10(k) proceeding to resolve a dispute of its own making.

*Recon Refractory, 339 N.L.R.B. at 827-28*. Accordingly, the Board quashed notice of hearing and terminated the proceedings. *Id. at 828*.

Recon objects to this decision, arguing that the Board erred by considering whether the dispute was "actually jurisdictional" rather than simply determining whether [**19] "reasonable cause" existed to believe that a violation of *§ 8(b)(4)(D)* had occurred. "The Board's legal conclusions as to the jurisdictional dispute must be upheld unless arbitrary and capricious." *Foley-Wismer & Becker v. NLRB (Foley-Wismer II), 695 F.2d 424, 427 (9th Cir. 1982)*. We have explained that this

424 F.3d 980, *; 2005 U.S. App. LEXIS 19709, **;
177 L.R.R.M. 3339; 151 Lab. Cas. (CCH) P10,536

standard gives the Board "considerable deference" in interpreting the NLRA and exercising its expertise. *USCP-Wesco II, 827 F.2d at 583; see also NLRB v. International Longshoremen's & Warehousemen's Union, 504 F.2d 1209, 1218-19 (9th Cir. 1974).* A Board decision is subject to reversal if it ignores a controlling legal standard. *USCP-Wesco II, 827 F.2d at 583.* However, "'if the Board's construction of the statute is "reasonably defensible," it should not be rejected merely because the courts might prefer another view of the statute.'" *Id.* (quoting *Int'l Alliance of Theatrical and Stage Employees v. NLRB, 779 F.2d 552, 555 (9th Cir. 1985)).*

The Supreme Court explained the deferential nature of the arbitrary and capricious standard in *Motor Vehicle* [**20] *Manufacturers Association of the United States, Inc. v. State Farm Mutual Auto Insurance Company* as follows:

> [*988] Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*463 U.S. 29, 43, 77 L. Ed. 2d 443, 103 S. Ct. 2856 (1983).* The Court noted that the scope of review is narrow and that we "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (quotation marks omitted). Under this deferential standard, we find no error in the Board's decision.

Ample precedent supports the Board's conclusion that an award of work under *§ 10(k)* is not warranted where the dispute is not "actually jurisdictional." *Recon Refractory, 339 N.L.R.B. at 827.* Section *10(k)* of the NLRA was enacted to provide a mechanism for resolving jurisdictional disputes [**21] between competing unions. The Supreme Court recognized that the law was designed "to protect employers from being 'the helpless victims of quarrels that do not concern them at all.'" *NLRB v. Radio and Television Broad. Eng'rs Union, Local 1212 (CBS), 364 U.S. 573, 581, 5 L. Ed. 2d 302, 81 S. Ct. 330 (1961)* (quoting H.R. Rep. No. 80-245, at 23 (1947)). In *CBS,* the Court noted that the statutory scheme presumes "that the employer has been placed in a situation where he finds it impossible to secure the benefits of stability from either of these contracts, not because

he refuses to satisfy the unions, but because the situation is such that he cannot satisfy them." *Id. at 582.* In short, *§ 10(k)* was enacted to "protect employers trapped between two competing unions." *USCP-Wesco II, 827 F.2d at 584.* It was not, however, intended to authorize the Board to resolve disputes that are truly between an employer and a union. *Id.*

With this goal of protecting innocent employers in mind, the Board has established a test for determining when a dispute is properly deemed jurisdictional and submitted to a *§ 10(k)* hearing. The Board typically conducts a three-step inquiry [**22] to determine "whether there is reasonable cause to believe that *§ 8(b)(4)(D)* of the Act has been violated." *Int'l Alliance of Theatrical and Stage Employees, Local Union No. 39 (Shepard Exposition Services), 337 N.L.R.B. 721, 723 (2002).* This requires a finding of reasonable cause to believe that (1) a union has used a proscribed means--such as picketing or threatening to picket--to enforce its claim to the work in dispute; (2) there are competing claims to the disputed work between rival groups of employees; and (3) there is no agreed-upon method for resolving the dispute voluntarily. *Laborers Int'l Union of N. Am., Local No. 1184 (Golden State Boring), 337 N.L.R.B. 157, 158 (2001).* When these requirements are met, the Board will award the disputed work to one or the other of the vying unions, based on considerations such as the employer's past practice, industry custom, and contract rights. *CBS, 364 U.S. at 577, 579.*

In most situations where reasonable cause exists to believe *§ 8(b)(4)(D)* has been violated, the Board is required to make an affirmative award of the work in dispute. *Id. at 586.* The Board, [**23] however, recognizes an exception to this rule upon a showing that "'the union's members had previously performed the work in dispute and the union was not attempting to expand its work jurisdiction.'" *Shepard Exposition Services, 337 N.L.R.B. at 723* (quoting *Int'l Bhd. of Teamsters Local* [*989] *107 (Reber-Friel Co.), 336 N.L.R.B. 518, 521 (2001))* (referring to this exception as a "work preservation defense"). Thus, even when the three-part test outlined above is technically satisfied and "the dispute may literally fall within the terms" of the NLRA, the Board will occasionally, as it did here, quash notice of hearing on the ground that the dispute is not "actually jurisdictional" and therefore not amenable to resolution under *§ 10(k).* [11] *See USCP-Wesco I, 280 N.L.R.B. at 820.* As the Board stated in *Safeway Stores,* "certainly it was not intended that every time an employer elected to reallocate work among his employees or supplant one group of employees with another, a 'jurisdictional dispute' exists within the meaning of" *§§ 8(b)(4)(D)* and *10(k). 134 N.L.R.B. at 1322.* That is simply not the type of dispute

424 F.3d 980, *; 2005 U.S. App. LEXIS 19709, **;
177 L.R.R.M. 3339; 151 Lab. Cas. (CCH) P10,536

Congress devised § 10(k) [**24] to resolve. *Id. at 1323.*

11    The Board's ruling in this case is consistent with a number of other Board decisions quashing notice of hearing under § 10(k) in similar circumstances. *See, e.g., Int'l Ass'n of Machinists & Aerospace Workers, Dist. 190 (SSA Terminal), 344 N.L.R.B. No. 126, at 3 (2005), available at* http://www.nlrb.gov/nlrb/shared_files/decisions/3 44/344-126.pdf (quashing notice of hearing after looking beyond the technical violation of § 8(b)(4)(D) to the "real nature and origin of the dispute"); *Int'l Bhd. of Elec. Workers Local 103 (Buffalo Elec. Constr.), 298 N.L.R.B. 937, 940 (1990)* ("although the facts here may literally fall within the terms of Sections 8(b)(4)(D) and 10(k), we conclude that the real nature of this dispute is to retrieve jobs that were subcontracted, not to acquire new work"); *Plumbers, Local 36 (Weinheimers, Inc.), 219 N.L.R.B. 1016, 1018 (1975)* (quashing notice of hearing where "the disagreement which led to the strike stemmed from a claim to unit work and the allegedly improper transfer of it out of the unit, rather than from the competing claims of groups of employees to work on jurisdictional grounds"); *Printing Pressmen, Local 7 (Chicago) (Metropolitan Printing Co.), 209 N.L.R.B. 320, 322 (1974)* (quashing notice of hearing after determining that the dispute was over "unit work," and finding that "to apply jurisdictional dispute principles to a unit work claim would distort the statute"); *Int'l Bhd. of Electrical Workers, Local 292 (Franklin Broad. Co.), 126 N.L.R.B. 1212, 1215 (1960)* (quashing notice of hearing when the real dispute arose after the employer terminated a group of union employees and assigned their duties to another group of employees; the union's objective in picketing to gain back those jobs for its members was one "which the Congress, in enacting Section 8(b)(4)(D), did not intend to proscribe").

[**25] The Supreme Court has recognized this exception with approval, noting that "the Board has adopted the position that jurisdictional strikes in support of contract rights do not constitute violations of [§ ] 8(b)(4)(D) despite the fact that the language of that section contains no provision for special treatment of such strikes." *CBS, 364 U.S. at 577 n.12.* We also have adopted this exception, affirming Board decisions quashing notice of hearing on the ground that the dispute was not truly jurisdictional, despite a literal violation of § 8(b)(4)(D). [12] *See, e.g., USCP-Wesco II, 827 F.2d at 584-85* (affirming a Board decision to quash notice of

[*990] hearing under § 10(k) because it was precipitated by the employer's violation of its collective bargaining agreement and thus was not actually jurisdictional); *Foley-Wismer II, 695 F.2d at 427-28* (affirming a Board decision to quash notice of hearing where no jurisdictional dispute existed because the work claimed by one union had never been performed or sought by the other union); *c.f. Waterway, 467 F.2d at 1018* (remanding to the Board for a decision on the merits [**26] under § 10(k) because the Board's decision to quash was based on factual findings unsupported by the evidence).

12    The District of Columbia Circuit similarly applies § 10(k) only where an "employer faces a jurisdictional dispute that is not of his own making and in which he has no interest;" more specifically, that court has noted that "where . . . the employer created the dispute, § 8(b)(4)(D) and § 10(k) do not apply." *International Longshoremen's & Warehousemen's Union, Local 62-B v. NLRB, 781 F.2d 919, 924, 925 (D.C. Cir. 1986).* *ILWU* involved facts very similar to those presented here: the employer created the dispute and the two employee groups began their quarrel over the disputed work only *after* the employer reassigned it away from the group that traditionally had performed it. *Id. at 925.* The court declined to characterize the dispute as "jurisdictional" and amenable to § 10(k) resolution because such a rule would allow an employer to create a jurisdictional dispute at any time simply by reassigning work. *Id.*

[**27] There are good reasons for such a policy. As the Supreme Court noted, "'to fail to hold as controlling the contractual preemption of the work in dispute would be to encourage disregard for observance of binding obligations under collective-bargaining agreements and invite the very jurisdictional disputes Section 8(b)(4)(D) is intended to prevent.'" *CBS, 364 U.S. at 577 n.12* (quoting *Nat'l Ass'n of Broadcast Engineers (NBC), 105 N.L.R.B. 355, 364 (1953)).* The Board has applied this rule out of respect for the bargain struck between the union and the employer, as well as for the positive benefits of work preservation clauses which would otherwise be rendered unenforceable. *USCP-Wesco I, 280 N.L.R.B. at 821* ("To hold that this dispute is a jurisdictional dispute to be decided by the Board would not allow the [union] employees the benefit of their negotiated work preservation clause."); *see also UAW, Dist. 190, Local Lodge 1414, 344 N.L.R.B. No. 126, at 3.* We have endorsed that rationale, adding that the Board's decision to quash notice of hearing in such cases advances the Congressional policy favoring arbitration rather than Board [**28] resolution of labor disputes. *USCP-Wesco II, 827 F.2d at 586* ("Too readily compelling Board reso-

Page 8

lution of labor disputes corrodes the congressional policy decision to favor arbitration of these disputes."). Finally, the quashing of a § 10(k) hearing does not leave an employer entirely without a remedy. As the Board has noted, employers who create disputes by their own actions "must use other means, such as arbitration, to resolve conflicting work claims." *United Bhd. of Carpenters and Joiners of Am., Local No. 13 (First Chicago NBD Corp.), 331 N.L.R.B. 281, 282 (2000).*

This case is a far cry from the typical § 10(k) scenario in which the unions' quarrel "is of so little interest to the employer that it seems perfectly willing to assign work to either if the other will just let him alone." *CBS, 364 U.S. at 579.* To the contrary, Recon intentionally created this dispute in an attempt to avoid its contractual obligations and lower its wage rates. Like *USCP-Wesco,* this case revolves around a contractual dispute between an employer and the only union whose members had historically performed the work in question. *280 N.L.R.B. at 818.* [**29] And like *USCP-Wesco,* the Board based its decision to quash on the fact that "but for [the employer's] violation of the contract [the union] would not be in any position to claim the work . . . ." *Id. at 819.*

To be sure, Recon *now* faces competing claims to the work in dispute by the Bricklayers and the IPTW. But *Safeway Stores* held that where an employer creates a dispute by transferring work to another group of employees who had no *previous* claim to that work, the dispute is not "actually jurisdictional" in the statutory sense and the Board will not make a § 10(k) ruling. [13] *134 N.L.R.B. at 1323.* Here, the IPTW's claim to the work very clearly postdates Recon's reassignment of the work in dispute. At the time of the reassignment, [*991] the Bricklayers were "the only group claiming the work." *ILWU, 781 F.2d at 925.* In *Safeway Stores,* the Board quashed notice of hearing because, like here, "the real dispute is wholly between [the union] and [the employer] and concerns only [the union]'s attempt to retrieve the jobs of its members, jobs which had been secured for more than 10 years by a series of collective-bargaining [**30] agreements until [the employer] suddenly terminated the bargaining relationship . . . ." *134 N.L.R.B. at 1323.*

13  In *NLRB v. Plasterers' Local Union No. 79,404 U.S. 116, 30 L. Ed. 2d 312, 92 S. Ct. 360 (1971),* the Supreme Court held that an employer is a party to a jurisdictional dispute and therefore must be afforded a chance to participate in § 10(k) proceedings. *Id. at 126, 131.* A settlement agreement between the two competing unions therefore cannot bind an unwilling employer. *Id. at 131.* The Court noted that under the "*Safeway*

rule," when one union renounces its claim to the disputed work, " § 10(k) proceedings are aborted despite legitimate interests an employer may have in securing a Board decision." *Id. at 134.* This is because "by definition, [a jurisdictional] dispute cannot exist unless there are rival claims to the work." *Id.* (quotation marks omitted). But the Court found the *Safeway* rule inapplicable in cases where the unions have agreed to arbitrate, because such an agreement is not equivalent to a union's disclaimer of the work. *Id. at 136.* Nothing in the Court's decision disturbs the Board's holding in *Safeway Stores.*

[**31] Recon attempts to distinguish *Safeway Stores* and *USCP-Wesco;* there are, surely, certain factual differences among the cases. *USCP-Wesco,* for example, involved two employers and began as a dispute over subcontracting. *280 N.L.R.B. at 818.* And in *Safeway Stores,* there was no indication that the union *receiving* the work had threatened or engaged in any economic action--instead, the picketing union was "attempting to retrieve the jobs of its members." *134 N.L.R.B. at 1323.* But these factual distinctions did not affect the Board's reasoning in either case. Instead, the critical fact the Board relied on in each case was that the employer had created the dispute by its own unilateral actions. [14] *Id.; see USCP-Wesco I, 280 N.L.R.B. at 822; see also UAW, Dist. 190, Local Lodge 1414, 344 N.L.R.B. No. 126, at 4* (quashing notice of hearing because the employer "by its own unilateral actions . . . has created a work preservation dispute"). This case therefore falls clearly within the established precedent.

14  The employers' actions also distinguish these cases from *Waterway.* The employer in *Waterway* reassigned work from non-employees to its own employees without violating any collective bargaining agreement. *467 F.2d at 1013; see also USCP-Wesco II, 827 F.2d at 585.* No party in *Waterway* ever claimed that the employer had deliberately created the dispute in order to evade its contractual obligations. *Waterway* is therefore much less instructive here than either *Safeway Stores* or *USCP-Wesco.*

[**32] Even if we had not decided that this case is squarely controlled by precedent, it is clear that the Board's reliance on *Safeway Stores* and *USCP-Wesco* is "reasonably defensible." *USCP-Wesco II, 827 F.2d at 583.* The determination that this case was not actually jurisdictional and therefore inappropriate for resolution under § 10(k) cannot be considered arbitrary and capricious. In sum, § 10(k) cannot be used as a tool to aid employers in avoiding their contractual obligations to employees when the terms of those contracts become

424 F.3d 980, *; 2005 U.S. App. LEXIS 19709, **;
177 L.R.R.M. 3339; 151 Lab. Cas. (CCH) P10,536

inconvenient. We agree with the Board that this dispute is not appropriate for resolution under § 10(k).

Recon's petition for review of the Board's decision and order quashing notice of hearing is therefore DENIED.

EXHIBIT 3

23

STEVEN D. ATKINSON, ESQ. - SBN 59094
THOMAS A. LENZ, ESQ. - SBN 152624
ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A Professional Corporation
17871 Park Plaza Drive, Suite 200
Cerritos, California  90703-8597
(562) 653-3200 - (714) 826-5480
FAX (562) 653-3333

Attorneys for Defendant
RECON REFRACTORY & CONSTRUCTION, INC.

```
                                          ┌──────────────────────┐
                                          │          FILED       │
                                          │ CLERK, U.S. DISTRICT COURT │
                                          │                      │
                                          │      SEP 1 8 2000     │
                                          │                      │
                                          │ CENTRAL DISTRICT OF CALIFORN: │
                                          │               DEP:   │
                                          └──────────────────────┘
```

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS, AFL-CIO, an unincorporated association,<br><br>          Plaintiff,<br><br>     v.<br><br>RECON REFRACTORY & CONSTRUCTION, INC., a California corporation,<br><br>          Defendant. | CASE NO. CV 00-06676 SVW (Mcx)<br><br>**STIPULATION FOR STAY OF DISCOVERY** |

    Whereas the parties to the above entitled case have been

informed by Region 21 of the National Labor Relations Board that

the Region intends to issue a Notice of a Section 10(k) Hearing

[29 U.S.C. Section 160(k)] under the National Labor Relations

Act [29 U.S.C. Section 151, et seq.] regarding the

jurisdictional dispute that exists between the parties hereto;

    And whereas the National Labor Relations Board's

-1-

STIPULATION FOR STAY OF DISCOVERY

04637.014\296597v1

1  determination in the Section 10(k) [29 U.S.C. 160(k)] hearing

2  will resolve the competing work assignment claims in this

3  action;

4

5      Therefore, the parties hereto through their undersigned

6  counsel hereby stipulate and agree as follows:

7

8      1.  Discovery in the instant action shall be stayed pending

9  final resolution of the work assignment dispute at issue in the

10 Section 10(k) [29 U.S.C. Section 160(k)] hearing, at which time

11 the stay shall expire;

12

13     2.  Neither party will destroy or otherwise dispose of any

14 documents relevant to the matters at issue during the period in

15 which discovery is stayed;

16

17     3.  The stay on discovery shall apply to motions to compel

18 with regard to discovery responses that have already been served

19 and produced; rather, such motions to compel will be reserved

20 until such time as the stay expires; and

21

22     4.  Either party may apply to the Court for relief from

23 the stay of discovery in the event that it believes there are

24 circumstances warranting such relief.  In that event, the moving

25 party's prior agreement to this Stipulation shall not be used

26 against it in opposing relief from the stay.

27

28

-2-

**STIPULATION FOR STAY OF DISCOVERY**

1        The foregoing is so agreed,

2

3    Dated: September 13, 2000     Respectfully submitted,

4

5                        Jeffrey B. Demain, SBN 126715
     ALTSHULER, BERZON, NUSSBAUM, RUBIN
     & DEMAIN

6    177 Post Street, Suite 300
     San Francisco, California 94108

7    (415) 421-7151

8

9    By: _____
          Jeffrey B. Demain

10

11   Attorneys for Plaintiff
     INTERNATIONAL UNION OF BRICKLAYERS
     AND ALLIED CRAFTWORKERS, AFL-CIO

12

13   ATKINSON, ANDELSON, LOYA, RUUD &
     ROMO

14

15   By: _____
16   Steven D. Atkinson

17   Attorneys for Defendant RECON
     REFRACTORY & CONSTRUCTION, INC.

18

19   The foregoing is so ordered,

20

21   Date: _SEP 1 8 2000_____    By: _____
                                            STEPHEN V. WILSON
22                                      UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28

-3-

**STIPULATION FOR STAY OF DISCOVERY**

04637.014\296597v2

EXHIBIT 4

Steven D. Atkinson, Esq.. - SBN 59094
Eugene F. McMenamin, Esq. - SBN 87083
Scott K. Dauscher, Esq. - SBN 204105
ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A Professional Corporation
17871 Park Plaza Drive, Suite 200
Cerritos, California 90703-8597
(562) 653-3200 - (714) 826-5480
FAX (562) 653-3333
Attorneys for Defendant,
RECON REFRACTORY & CONSTRUCTION, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFT WORKERS, AFL-CIO, an unincorporated association,<br><br>Plaintiff,<br><br>v.<br><br>RECON REFRACTORY & CONSTRUCTION, INC., a California corporation,<br><br>Defendant. | CASE NO.: CV 00-06676 SVW (MCx)<br><br>DEFENDANT'S SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS COMPLAINT<br><br>[Declaration of Eugene F. McMenamin in support thereof filed concurrently herewith]<br><br>Date: July 10, 2006<br>Time: 1:30 p.m.<br>Crtrm: 6 |

///
///
///
///
///
///
///

004637.00014/644651v1

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| I. | INTRODUCTION ........................................................ | 1 |
| II. | ARGUMENT ............................................................ | 2 |
| | A. The Complaint Seeks Damages for Breach of the Labor Agreement. This Claim Falls Squarely Within the Labor Agreement's Grievance Arbitration Provision. .................... | 2 |
| | B. BAC's Complaint for Damages for Breach of the Labor Agreement is Not Excluded From the Labor Agreement's Grievance Arbitration Provision by Claiming it is a "Jurisdictional Dispute." ............................................. | 8 |
| | C. BAC's Complaint Must Be Dismissed For Failure To Exhaust Contractual Remedies. ............................................. | 12 |
| III. | CONCLUSION .......................................................... | 14 |

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
17871 PARK PLAZA DRIVE, SUITE 200
CERRITOS, CALIFORNIA 90703-8597
(562) 653-3200 · (714) 826-5480
FAX (562) 653-3333

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

004637.00014/644651v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
17871 PARK PLAZA DRIVE, SUITE 200
CERRITOS, CALIFORNIA 90703-8527
(562) 653-3200 • (714) 826-5480
FAX (562) 653-3333

**TABLE OF AUTHORITIES**

Page

**FEDERAL CASES**

*AT&T Technologies, Inc. v. Communication Workers of America,*
    475 U.S. 643 (1986)..................................................................................9

*Bechtel Corp. v Local 215 Laborers International Union,*
    544 F.2d 1207 (3rd Cir. 1976) ....................................................10, 12

*Building Materials & Construction Teamsters Local 216 v. Granite Rock Co.,*
    851 F.2d 1190 (9th Cir. 1988) ..................................................9, 12

*Carpenter's Health and Welfare Trust Fund for California*
    *v. Bla-Delco Construction Co., Inc.,*
    8 F.3d 1365 (9th Cir. 1993) .......................................................1

*Costa Legal Assistance Workers v. Contra Costa Legal Services Foundation,*
    878 F.2d 329 (9th Cir. 1989) ......................................................9

*Del Costello v. International Brotherhood of Teamsters, et al.,*
    462 U.S. 151 (1983)....................................................................2

*Industrial Professional and Technical Workers International Union, et al. and Recon*
    *Refractory, et al.,*
    339 N.L.R.B. 825 (2003) ...........................................................5

*Inlandboatmens Union of the Pacific v. Dutra Group,*
    279 F.3d 1075 (9th Cir. 2002) ................................................1, 13

*Local Union 1423 Glaziers v. P.P.G. Industries, Inc.,*
    378 F. Supp. 991 (N.D.Ind. 1974) ...........................................11

*Recon Refractory & Construction Inc., et al. v. National Labor Relations Board,*
    424 F.3d 980 (9th Cir. 2005) .............................................5, 6, 12

*Rissetto v. Plumbers and Steam Fitters Local 343, et al.,*
    94 F.3d 597 (9th Cir. 1996) ......................................................6

*Ritza v. International Longshoremen's and Warehousemen's U.,*
    837 F.2d 365 (9th Cir. 1988) ................................................1, 13

*Schneider Moving and Storage Co. v. Robbins,*
    466 U.S. 364 (1984) .................................................................I

*Teamsters Local 315 v. Union Oil Co. of California,*
    856 F.2d 1307 (9th Cir. 1988) cert. denied, 488 U.S. 1043 (1989) ...............9, 12

*Teamsters Union Local 315 v. Great Western Chemical Company,*
    781 F.2d 764 (9th Cir. 1985) ................................................1, 13

004637.00014/644651v1

1

**TABLE OF AUTHORITIES**

2
Page

3  *United Steel Workers of America v. Lukens Steel Company, et al.,*
      969 F.2d 1468 (3rd Cir. 1992) ..............................................................12

4

   *United Steel Workers v. Warrior & Gulf Navigation Co.,*
5     363 U.S. 574 (1960)............................................................................9

6  *Wagner, et al. v. Professional Engineers in California Government, etc., et al.,*
      354 F.3d 1036 (9th Cir. 2004) ............................................................6

7

   *Westinghouse Hanford Co. v. Hanford Atomic Metal Trades Council,*
8     940 F.2d 513 (9th Cir. 1991) ............................................................12

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
17871 PARK PLAZA DRIVE, SUITE 200
CERRITOS, CALIFORNIA, 90703-8597
(562) 653-3200 • (714) 826-5480
FAX (562) 653-3333

004637.00014/644651v1

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
17871 PARK PLAZA DRIVE, SUITE 200
CERRITOS, CALIFORNIA 90703-8597
(562) 653-3200 (714) 826-5480
FAX (562) 653-3333

# I.    INTRODUCTION

Before the court is a motion by Plaintiff International Union of Bricklayers and Allied Craft Workers, AFL-CIO ("BAC") for leave to file a First Amended Complaint ("FAC") to incorporate new plaintiffs (the labor agreement's trust funds) as well as ERISA claims for delinquent trust fund contributions.    The FAC also seeks to add as defendants the individual corporate officers of defendant Recon Refractory & Construction, Inc. ("Recon") on various corporate veil piecing theories.  The FAC makes an eye catching allegation at paragraph 35 of wholesale breaches of the Labor Agreement by Recon claiming damages in the excess of $4 million.

Recon opposed the Motion to Amend.  At the hearing on the motion on June 12, 2006, Recon argued that the FAC is an effort to resuscitate a complaint that fails to state a claim under Rule 12(b).  Recon argued that the complaint is for damages. As such, it falls squarely within the scope of the labor agreement's grievance arbitration provision.  Having failed to move to compel arbitration timely, the complaint fails to state a claim upon which relief can be granted.

Recon argued that Ninth Circuit precedent required dismissal of the complaint.  See *Inlandboatmens Union of the Pacific v. Dutra Group* 279 F.3d 1075, 1084 (9th Cir. 2002); *Ritza v. Int'l Longshoremen's and Warehousemen's U.* 837 F.2d 365, 371 (9th Cir. 1988).

Unlike BAC, trust funds need not comply with the labor agreement's grievance and arbitration provisions to enforce contribution obligations under the labor agreement.  *Schneider Moving and Storage Co. v. Robbins* 466 U.S. 364 (1984); *Carpenter's Health and Welfare Trust Fund for California v. Bla-Delco Construction Co., Inc.* 8 F.3d 1365 (9th Cir. 1993).  BAC's FAC seeks to add these funds as plaintiffs to paper over BAC's failure to exhaust administrative remedies and the running of the statute of limitations for a motion to compel arbitration of this grievance under the labor agreement. See *Teamsters Union Local 315 v. Great*

1  *Western Chemical Company* 781 F.2d 764, 767 (9th Cir. 1985) (six-month statute of
2  limitation applicable to a motion to compel arbitration).  See generally, *Del Costello*
3  *v. International Brotherhood of Teamsters, et al.* 462 U.S. 151 (1983).
4      The court ordered further briefing to address the underlying jurisdictional
5  issues raised by Recon which it claims moots BAC's Motion for Leave to Amend.

6

## II.    ARGUMENT

**A.    The Complaint Seeks Damages for Breach of the Labor**
**Agreement.  This Claim Falls Squarely Within the Labor**
**Agreement's Grievance Arbitration Provision.**

11

12      The complaint alleges BAC and Recon were signatory to the Bricklayers'
13  National Agreement for Refractory Construction ("Labor Agreement").  (Complaint
14  at ¶5.)  The operative Labor Agreement was previously submitted by BAC as part
15  of its Motion to Dismiss the Counterclaim and Third Party Complaint on August
16  14, 2000.  (See Docket 16, 17, 18 and 19.)  The Labor Agreement is attached as
17  Exhibit 1 to the Declaration of John Flynn.  (Docket 18.)  Article II, **SCOPE**,
18  Section C sets forth in exhaustive detail the scope of work covered by the Labor
19  Agreement.  For ease of reference, the Labor Agreement is attached to the
20  accompanying Declaration of Eugene F. McMenamin as Exhibit 1.
21      In Article II, Section D, the parties agree to augment the scope of bargaining
22  union work covered by Article II, Section C to include newly developed products or
23  systems that ". . . are determined by the parties to fall within the work jurisdiction
24  of this Agreement."

25

26      Article II, Section E provides:
27      If a jurisdictional dispute arises over an assignment of work by the
28      Employer and it cannot be resolved at the local level, it shall be

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
17871 PARK PLAZA DRIVE, SUITE 200
CERRITOS, CALIFORNIA 90703-8597
(562) 653-3200 (714) 826-5480
FAX (562) 653-3333

1    referred to the General Presidents of the disputing Unions for

2    resolution.

3        Paragraph 7 of the complaint alleges that Recon breached Article II, Section

4    C of the Labor Agreement by assigning bargaining union work to another labor

5    organization: ". . . work which has been historically or traditionally assigned to

6    members of [BAC] . . . ." At paragraph 8 of the complaint, BAC seeks traditional

7    contractual damage remedies for this breach of agreement, ". . . including but not

8    limited to, union dues, lost wages, and lost fringe benefit contributions . . . ."

9        The Labor Agreement contains a broad grievance arbitration procedure. (See

10   Article XI and XII.)  Article XI designates the arbitration body for final resolution

11   of disputes.    Article XII sets forth the grievance process in detail up to and

12   including binding arbitration.  Section A states in pertinent part:

14       It is specifically agreed that any controversy arising during the

15       effective period of this Agreement involving the application or

16       interpretation of any of its terms and conditions, other than a

17       jurisdictional dispute over the assignment of work shall be settled in

18       accordance with the grievance procedure set forth in this Article . . . .

19               *      *      *

20       Step 4. If the matter is not resolved by the International Union and the

21       Employer, the dispute will be submitted to the International Masonry

22       Institute Disputes for Settlement Resolution . . .  The decision reached

23       in accordance with the Plan's procedures shall be binding upon all

24       parties.

26       The corollary of this expansive grievance arbitration procedure is the

27   agreement's no strike provision, Article XVI, **No Strike, No Lock-Out,** which

28   provides there shall be no strikes or lock-outs over disputes concerning the

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
17871 PARK PLAZA DRIVE, SUITE 200
CERRITOS, CALIFORNIA 90703-8597
(562) 653-3200 · (714) 826-5480
FAX (562) 653-3333

1 agreement during its term until the grievance procedure set forth in Article XII has

2 been exhausted and only in the event a party fails or refuses to abide by a final

3 decision.

4     The complaint at ¶9 alleges without elaboration that BAC has exhausted all

5 contractual remedies required by the Labor Agreement.  BAC has amplified its

6 exhaustion allegation in a later filing with this court in its Motion to Dismiss

7 Counter Claim and Third Party Complaint. (See Docket 16, 17, 18 and 19.) BAC's

8 Memorandum of Points and Authorities (Docket 16) makes this bald claim:

9     The Complaint describes a classic jurisdictional dispute over the

10     assignment of work: does the work belong to employees represented

11     by one union or by employees represented by another union?

12 Memorandum of Points and Authorities at 19, lines 27-29.

13     As a matter of law BAC's assertion that the complaint describes a "classic

14 jurisdictional dispute over the assignment of work . . ." is factually and legally

15 wrong.  It is even contrary to BAC's stated position before the National Labor

16 Relations Board ("NLRB") and the Ninth Circuit in this matter where it forcefully

17 argued that the dispute here was not a jurisdictional dispute:

18

19     Local 4 moves to quash the notice of hearing, arguing that the dispute

20     involves a work preservation claim on behalf of Recon's bricklayers

21     whom it represents rather than the kind of jurisdictional dispute

22     appropriate for resolution through Sections 8(b)(4)(D) and 10(k) of the

23     Act.  It argues that Recon created this dispute by assigning the work

24     traditionally performed by the bricklayers to IPTW-represented

25     laborers in violation of the [National Refractory Agreement].

26     According to Local 4, Recon is therefore not the "innocent" employer,

27     caught between two rival unions claiming the same work, for who

28     Congress intended to provide relief under section 10(k).

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
17871 PARK PLAZA DRIVE, SUITE 200
CERRITOS, CALIFORNIA 90703-8597
(562) 653-3200 · (714) 826-5480
FAX (562) 653-3333

1   *Industrial Professional and Technical Workers International Union, et al. and*
2   *Recon Refractory, et al.* 339 NLRB 825, 826 (2003).    (See McMenamin
3   Declaration, Exhibit 2.)

4

5       The Ninth Circuit was more emphatic in accepting the NLRB's holding that
6   no jurisdictional dispute was implicated here by BAC's insistence on enforcing the
7   Labor Agreement against Recon:

8       The dispute at issue is fundamentally a work preservation dispute
9       between Recon and the bricklayers and not an inter-union
10      jurisdictional dispute between the Bricklayers and the IPTW.  Because
11      Recon itself precipitated the dispute in an attempt to avoid its
12      obligations to the Bricklayers, we deny Recon's petition for review . . .
13  *Recon Refractory & Construction Inc., et al. v. National Labor Relations Board* 424
14  F.3d 980, 982 (9th Cir. 2005).

15

16      The Ninth Circuit took pains to reiterate that this was a contractual
17  enforcement dispute - not a jurisdictional dispute.

18      . . . Recon intentionally created this dispute in an attempt to avoid its
19      contractual obligations and lower its wage rates.  Like *USCP-Wesco,*
20      this case revolves around a contractual dispute between an employer
21      and a union whose members had historically performed the work in
22      question.  280 NLRB at 818.  And like *USCP-Wesco,* the Board based
23      its decision to quash on the fact that "but for [the Employer's] violation
24      of the contract [the union] would not be in any position to claim the
25      work . . ."
26  424 F.3d at 990.

27  / / /

28  / / /

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
17871 Park Plaza Drive, Suite 200
Cerritos, California 90703-8597
(562) 653-3200 • (714) 826-5480
FAX (562) 653-3333

004637.00014/644651v1

The Ninth Circuit crystallized its ruling thusly:

1     To be sure, Recon *now* faces competing claims for the work in dispute
2     by the Bricklayers and the IPTW. But *Safeway Stores* held that where
3     an employer creates a dispute by transferring work to another group of
4     employees who have *no previous* claim to that work, the dispute is not
5     "actually jurisdictional" in the statutory sense and the Board make a
6     §10(k) ruling. [citation omitted] Here, the IPTW's claim to the work
7     very clearly postdates Recon's reassignment of the work in dispute. At
8     the time of the reassignment the Bricklayers were "the only group
9     claiming the work."

*Id.*

Recon's dispute with the Bricklayers is hardly the "classic jurisdictional dispute" BAC seeks to portray here in order to escape dismissal of its complaint for failing to exhaust contractual remedies.

The holding of the NLRB, as affirmed by the Ninth Circuit, is entitled to collateral estoppel effect. But even were it otherwise, BAC's new found claim that the complaint is a "classic jurisdictional dispute" runs afoul of the Ninth Circuit doctrine of judicial estoppel. See *Rissetto v. Plumbers and Steam Fitters Local 343, et al.* 94 F.3d 597, 600-605 (9th Cir. 1996) ("Judicial estoppel sometimes also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position.") See also, *Wagner, et al. v. Professional Engineers in California Government, etc., et al.* 354 F.3d 1036, 1044 (9th Cir. 2004).

BAC's painting this contract damage action as a "classic jurisdictional dispute" is frivolous to the point of risking invocation of Rule 11 sanctions. BAC's attempt to argue express removal of this "classic jurisdictional dispute" from the grievance arbitration provision looks farcical in light of the fact that, prior to filing

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
17871 PARK PLAZA DRIVE, SUITE 200
CERRITOS, CALIFORNIA 90703-8597
(562) 653-3200 (714) 826-5480
FAX (562) 653-3333

004637.00014/644651v1

the complaint, it had actually invoked the grievance arbitration procedure to resolve this work assignment dispute.   On January 28, 2000, BAC filed a series of grievances against Recon claiming damages over Recon's failure to comply with the Labor Agreement by assigning work outside of the bargaining unit of bricklayers.   (See McMenamin Declaration, Exhibit 3, grievances dated January 28, and February 7, 2000.)

These grievances proceeded through Step 3 of the grievance procedure.   The grievances were not amicably resolved at Step 3.   The results of Step 3 were documented in the "Recon Grievance Report" dated February 5, 2000 signed by William J. Ruff, Executive Director, National Refractory Committee for BAC.   (See McMenamin Declaration, Exhibit 4.)   This union-drafted formal report of Step 3 proceedings is an admission that this work assignment dispute comes within the Labor Agreement's mandatory grievance procedure.   Indeed, only before this court has BAC had the temerity to claim that this labor dispute constituted a jurisdictional dispute excluded from the grievance arbitration provision.   As late as April 18, 2003 BAC was still initiating grievances under Article XII for the continued violations by Recon of Article II Section C **WORK ASSIGNMENT.**   (See McMenamin Declaration, Exhibit 5, grievance dated April 18, 2003 alleging ongoing grievance "failure to assign to BAC members, work which is and has historically been traditionally assigned to members of this organization.")

BAC's February 5, 2000 Grievance Report (See McMenamin Declaration, Exhibit 5) paints Recon as a signatory Employer openly challenging the Labor Agreement.   BAC could have, and should have, taken the grievance to Step 4 of the grievance procedure, final and binding dispute resolution before the International Masonry Institute Settlement Plan.   It did not do so.   It cannot cure that failure to exhaust contractual remedies within the applicable statute of limitations by now re-characterizing the dispute as a "jurisdictional dispute."

/ / /

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
17871 PARK PLAZA DRIVE, SUITE 200
CERRITOS, CALIFORNIA 90703-8597
(562) 653-3200 · (714) 826-5480
FAX (562) 653-3333

**B.** **BAC's Complaint for Damages for Breach of the Labor Agreement is Not Excluded From the Labor Agreement's Grievance Arbitration Provision by Claiming it is a "Jurisdictional Dispute."**

Despite taking the instant dispute to Step 3 of the grievance procedure, BAC now claims that the dispute is excluded from this grievance procedure by virtue of language in Article XII, Section A, ". . . other than a jurisdictional dispute over the assignment of work . . ." BAC claims that this clause, read in conjunction with Article II, Section E, provides an express removal from the grievance arbitration clause for this damage action. (See BAC Memorandum of Points and Authorities in Support of Motion to Dismiss at 1-4.) (Docket 16) BAC argues that disputes alleging violations of the work assignment provisions of Article II are handled through discussion at the local level and then, if necessary through referral to the General Presidents of the affiliated international unions, whereas all other disputes alleging violations of any other Articles or sections of the agreement are handled through the filing of a grievance and processing it through the grievance procedure set forth in Article XII. (BAC Memorandum of Points and Authorities in Support of Motion to Dismiss at 3-4.) The BAC Motion to Dismiss includes declarations of BAC Local 4 Union President, Frank Collins, and BAC International Union President, John Flynn. In summary, those declarations describe a few anemic attempts to stop the IPTW from performing work claimed by BAC.

BAC's reference to Article II, Section E, is an artifice to deflect attention from the only issue here: does Article XII, Section A, by the language " . . . other than a jurisdictional dispute over the assignment of work shall be settled in accordance with the grievance procedure set forth in this Article . . ." negate the presumption of arbitrability of this damage claim? Manifestly not.

///

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
17871 PARK PLAZA DRIVE, SUITE 200
CERRITOS, CALIFORNIA 90703-8597
(562) 653-3200 · (714) 826-5480
FAX (562) 653-3333

1   A broad arbitration clause in a collective bargaining agreement creates the
2   presumption of arbitrability. *United Steel Workers v. Warrior & Gulf Navigation*
3   *Co.* 363 U.S. 574, 583 (1960). An order compelling a party to arbitrate should not
4   be denied "unless it may be said with positive assurance that the arbitration clause
5   is not susceptible of an interpretation that covers the asserted dispute. Doubts
6   should be resolved in favor of coverage." *AT&T Technologies, Inc. v.*
7   *Communication Workers of America* 475 U.S. 643, 650 (1986). However, evidence
8   of a purpose to exclude a claim from arbitration rebuts the presumption of
9   arbitrability. *Teamsters Local 315 v. Union Oil Co. of California* 856 F.2d 1307,
10  1314 (9th Cir. 1988) cert. denied, 488 U.S. 1043 (1989).

11  In heading this admonition, the Ninth Circuit has noted that to determine the
12  nature of the grievance, " . . . we must review the specific language of the collective
13  bargaining agreement *and* facts alleged in the grievance." *Contra Costa Legal*
14  *Assistance Workers v. Contra Costa Legal Services Foundation* 878 F.2d 329, 330
15  (9th Cir. 1989).

16  *Building Materials & Construction Teamsters Local 216 v. Granite Rock Co.*
17  851 F.2d 1190 (9th Cir. 1988) underscores that doubts concerning arbitrability will
18  be resolved normally in favor of arbitration. There, Granite Rock appealed the
19  District Court's order granting summary judgment in favor of the union compelling
20  the parties to arbitrate the question whether Granite Rock violated an implied
21  covenant in its labor agreement.

22  The dispute centered on the action of Granite Rock shareholders reviving a
23  shell corporation as a subsidiary of Granite Rock, which resulted in a new concrete
24  ready mix plant undertaking operations in the name of Harbor Ready-Mix. The
25  union filed a grievance against Granite Rock asserting that Harbor and Granite
26  Rock were alter egos and that Granite Rock had breached the agreement by
27  operating Harbor without applying the labor agreement to its operations. Prior to
28  litigation on a motion to compel arbitration, the NLRB Regional Director issued a

*(left margin, vertical text)* ATKINSON, ANDELSON, LOYA, RUUD & ROMO · A PROFESSIONAL CORPORATION · ATTORNEYS AT LAW · 17871 Park Plaza Drive, Suite 200 · Cerritos, California 90703-8597 · (562) 653-3200 · (714) 826-5480 · FAX (562) 653-3333

:004637.00014/644651v1

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
17871 PARK PLAZA DRIVE, SUITE 200
CERRITOS, CALIFORNIA 90703-8597
(562) 653-3200 · (714) 826-5480
FAX (562) 653-3333

1  unit clarification rejecting the union's alter ego claim and determining that the

2  bargaining unit of ready-mix drivers at Granite Rock's facility did not include

3  Harbor's employees.   In reaching its decision, the Regional Director found that

4  Harbor was not a signatory to the agreement, that the operations of both entities

5  were dissimilar and that they neither shared nor exchanged personnel and that

6  Granite Rock did not play a consequential role in Harbor's business and personnel

7  decisions.    The Ninth Circuit affirmed the District Court's order compelling

8  arbitration consistent with established federal labor policy favoring arbitration in

9  circumstances involving a broad arbitration clause.

10      The BAC Labor Agreement grievance arbitration clause is similarly

11  expansive.  The Third Circuit's decision in *Bechtel Corp. v Local 215 Laborers*

12  *Int'l Union* 544 F.2d 1207 (3rd Cir. 1976) presents the guide posts for resolving the

13  issue of arbitrability here in the face of BAC's claim that there exists a broad

14  arbitration clause which is negated by express exclusion language.  There, Bechtel

15  brought an action for damages suffered because of work stoppages triggered from

16  jurisdictional disputes between certain unions which allegedly violated no strike

17  language of the collective bargaining agreement.  The Court of Appeals specifically

18  determined that both agreements excluded jurisdictional disputes from the reach of

19  the arbitration provisions.  The Third Circuit determined that while this bona fide

20  jurisdictional dispute was not arbitrable under the express contractual language,

21  Bechtel was still entitled to arbitrate its claim that the work stoppage constituted a

22  breach of the no strike clause resulting in consequential damages to Bechtel.  The

23  Third Circuit saw no reason for an arbitrator to have to deal with the express

24  exclusion from arbitration involving jurisdictional disputes by arbitrating the issue

25  whether the strike violated the no strike provision thereby entitling Bechtel to

26  damages.  544 F.2d at 1214.

27  ///

28  ///

1    This is exactly the situation here. Even if BAC's frivolous coinage of the

2    dispute as "jurisdictional" goes unchallenged, and even were such a jurisdictional

3    dispute to be determined to be affirmatively removed from the grievance arbitration

4    Article by express contract language, as in *Bechtel Corp.*, the damage claim by

5    BAC here is not an excludable jurisdictional dispute. It is a damage claim. As such

6    it is arbitrable.

7    *Bechtel Corp.* also contains a discussion of why true jurisdictional disputes

8    are often times excluded from a grievance arbitration provision. It helps put the

9    issue in perspective.

10    Jurisdictional disputes usually involve controversies between trade

11    unions competing for assignment of work with the employer caught in

12    the middle. They are highly volatile, and ordinarily involve delicate

13    questions of union policy and knowledge of union organizational

14    commitments and industry problems. Moreover, such disputes more

15    often than not are with unions not parties to the employer's collective

16    bargaining agreement. The merits of such disputes are best left to the

17    settlement machinery fashioned by the parties for the purpose. Article

18    XIV of the National Agreement and Article XII of the Local

19    Agreement unequivocally provide that jurisdictional disputes are to be

20    submitted to the National Joint Board. This agency apparently has the

21    necessary expertise, the confidence of the parties "and knowledge of

22    the building and construction industry and its unique problems and

23    solutions therefore which an arbitrator may not possess." *Local Union*

24    *1423 Glaziers v. P.P.G. Industries, Inc.,* 378 F.Supp. 991, 999

25    (N.D.Ind. 1974). Moreover, the National Joint Board may be able to

26    bind the unions involved in the jurisdictional dispute who are not

27    parties to the collective bargaining agreement with Bechtel, a power

28    the arbitrator does not enjoy. [citations omitted].

904637.00014/644651v1

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
17871 Park Plaza Drive, Suite 200
Cerritos, California 90703-8597
(562) 653-3200 · (714) 826-5480
FAX (562) 653-3333

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
17871 PARK PLAZA DRIVE, SUITE 200
CERRITOS, CALIFORNIA, 90703-8597
(562) 653-3200 (714) 826-5480
FAX (562) 653-3333

1   *Bechtel Corp.* 544 F.2d at 1214.

2       Properly framed, this dispute for money damages may only be determined to

3   fall outside the mandatory grievance arbitration procedure if the Labor Agreement

4   contains language expressly removing the subject from inclusion.  See generally

5   *United Steel Workers of America v. Lukens Steel Company, et al.* 969 F.2d 1468 (3rd

6   Cir. 1992).

7       In *Teamsters Local 315 v. Union Oil Co.* 856 F.2d 1307 (9th Cir. 1988), the

8   court held that a dispute over an employee's ability to return to his job after sick

9   leave was not arbitrable.  The court relied on contract language allowing arbitration

10  of disputes over only "express terms or provisions" of the contract.  By contrast, in

11  *Teamsters Local 216 v. Granite Rock Co., supra,* the Ninth Circuit held that a

12  dispute over an implied covenant was arbitrable under contract language providing

13  for arbitration of "all disputes arising under this agreement."  See also

14  *Westinghouse Hanford Co. v. Hanford Atomic Metal Trades Council* 940 F.2d 513

15  (9th Cir. 1991) (arbitration ordered; clause called for "interpretation or application

16  of the provision of this agreement").

17

18      **C.    BAC's Complaint Must Be Dismissed For Failure To**

19         **Exhaust Contractual Remedies.**

20

21      It is indisputable that Recon's open and notorious conduct commencing at the

22  Arco Refinery of challenging the Labor Agreement by assigning covered work to

23  the IPTW was an ongoing dispute with BAC from January 2000.  See *Recon supra*

24  424 F.3d at 983-85.  BAC never wavered that such conduct constituted a breach of

25  the Labor Agreement and was within the scope of the grievance arbitration

26  provision of Article XII.  BAC early on invoked a grievance arbitration procedure

27  by filing formal written grievances in January 2000 seeking damages.

28  (McMenamin Declaration, Exhibit 3.)  That grievance procedure proceeded through

1    Step 3 memorialized in a BAC generated document entitled "Recon Grievance
2    Report" February 5, 2000. (McMenamin Declaration, Exhibit 4.) In the final
3    sentence of that report, BAC specifically identifies the matter as being ". . . in Step
4    3 of the grievance procedure . . . ."

5    BAC did not take this open and notorious conduct to Step 4, final and
6    binding arbitration. Instead, on or about June 21, 2000 it filed the instant complaint
7    seeking the same relief. As of the date of filing the complaint, BAC was well
8    within the 6 month statute of limitations for initiating a motion to compel
9    arbitration. See generally *Teamsters Union Local 315 v. Great Western Chemical*
10   *Co.* 781 F.2d 764, 769 (9th Cir. 1986).

11   The 6 month statute of limitations period enables parties to attempt private
12   dispute reconciliation yet provides for a relatively rapid resolution of the labor
13   dispute. 781 F.2d at 767. Consistent with Ninth Circuit precedent discussed in
14   *Inlandboatmens Union of the Pacific, supra,* the trial court considered evidence
15   outside the pleadings in considering a similar Rule 12 motion. 279 F.3d at 1083.
16   See also *Ritza* 837 F.2d at 369 ("The court has broad discretion as to the methods to
17   be used in resolving factual disputes over matter in abatement.")

18   Based upon this long settled federal labor policy, the court should dismiss the
19   complaint. Inasmuch as the trust funds have independent claims for relief, they may
20   file their own lawsuit at a time of their own choosing.

21   ///
22   ///
23   ///
24   ///
25   ///
26   ///
27   ///
28   ///

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
17871 Park Plaza Drive, Suite 200
Cerritos, California 90703-8597
(562) 653-3200 · (714) 826-5480
FAX (562) 653-3333

1

**III.    CONCLUSION**

2     For the foregoing reasons Recon respectfully requests that the complaint be

3     dismissed with prejudice.

4     Dated:  June 21, 2006                 Respectfully submitted,

5                                           ATKINSON, ANDELSON, LOYA, RUUD
                                            & ROMO
6

7     By: _____

8                                           Eugene F. McMenamin
                                            Attorneys for Defendant RECON
9                                           REFRACTORY & CONSTRUCTION

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
17871 PARK PLAZA DRIVE, SUITE 200
CERRITOS, CALIFORNIA 90703-8597
(562) 653-3200 · (714) 826-5480
FAX (562) 653-3333

1

## PROOF OF SERVICE

2

(Code Civ. Proc. § 1013a(3))

3    STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

4       I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and am not a party to the within action; my business address is 17871 Park Plaza Drive, Suite 200, Cerritos, CA 90703-8597.

6       On June 22, 2006, I served the following document(s) described as **DEFENDANT'S SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES** on the interested parties in this action as follows by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

8

Jeffrey B. Demain, Esq.                    Attorneys For Plaintiff

9    Claire Prestel, Esq.
ALTSHULER, BERZON,

10    NUSSBAUM, RUBIN & DEMAIN
177 Post Street, Suite 300

11    San Francisco, CA 94108
(415) 421-7151

12    (415) 362-8064 - FAX
jdemain@altshulerberzon.com

13    cprestel@altshulerberzon.com

14  ☑   **BY MAIL:** I deposited such envelope in the mail at Cerritos, California. The envelope(s)

15       was mailed with postage thereon fully prepaid. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with U.S.

16       postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage

17       meter date is more than one day after date of deposit for mailing in affidavit.

18  ☐   **BY OVERNIGHT COURIER:** I sent such document(s) on June 22, 2006, by
OVERNITE EXPRESS with postage thereon fully prepaid at Cerritos, California.

19  ☑   **BY FAX:** I sent such document by use of facsimile machine telephone number (562) 653-

20       3333. Facsimile cover sheet and confirmation is attached hereto indicating the recipients' facsimile number and time of transmission pursuant to California Rules of Court Rule

21       2008(e). The facsimile machine I used complied with California Rules of Court Rule 2003(3) and no error was reported by the machine.

22  ☐   **BY PERSONAL SERVICE:** I delivered such envelope by hand to the offices of the

23       addressee(s).

24       I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

25       Executed on June 22, 2006, at Cerritos, California.

26

27                                                          Theresa Macaulay

28

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
17871 PARK PLAZA DRIVE, SUITE 200
CERRITOS, CALIFORNIA 90703-8597
(562) 653-3200 · (714) 826-5480
FAX (562) 653-3333

004637.00014/644651v1                              -15-

EXHIBIT 5

Recon
Page 2 of 7

**I.** **Withdrawal Liability Allocation to Recon**

Based on an actual withdrawal date of February 2005

| | | |
|---|---|---:|
| 1. | December 31, 2004 initial plan year unfunded present value of vested benefits | $595,226,287 |
| 2. | Total contributions of withdrawing employer January 1, 2000 to December 31, 2004 | 396,557* |
| 3. | Total contributions of all employers January 1, 2000 to December 31, 2004 | 359,187,717 |
| 4. | Allocable share of liability: [(1) x (2) ÷ (3)] | 657,153 |
| 5. | Excused due to De Minimis Rule** | 0 |
| 6. | Net withdrawal liability: (4) - (5) | 657,153 |

---

\*    The employer contributions used for 2000 through 2004 are $79,311.45 per year (average contributions in 1997 and 1998), as estimated by the Fund.

\*\*   The de minimis deductible is equal to $50,000 reduced $1 for each $1 that the allocable share of liability exceeds $100,000. If the allocable share of liability exceeds $150,000, the de minimis deductible is $0.

II.    **Determining Payment Amount and Length of Payment Period for Recon**

    (a)    Withdrawal liability    $657,153

        Hours of contributions for fiscal years ended December 31:

| | | | |
|---|---|---|---|
| 1995 | 73,927 | 2000 | 84,665* |
| 1996 | 61,691 | 2001 | 84,665* |
| 1997 | 79,135 | 2002 | 84,665* |
| 1998 | 90,194 | 2003 | 84,665* |
| 1999 | 41,902 | 2004 | 84,665* |

    (b)    Highest consecutive three-year average hours in the last 10 years prior to the year of withdrawal    84,665

    (c)    Highest contribution rate in 10 years ending with year of withdrawal    $1.60

    (d)    Required annual payment: (b) x (c)    $135,464

    (e)    Amortization ratio: (a) / (d)    4.851126

    (f)    Largest value in Factor Table Column I which is less than (e)    4.349326

    (g)    Number of years for value (f)    5

    (h)    Amount amortized in (g) years: (d) x (f)    $589,177.13

    (i)    Amount left to amortize: (a) - (h)    $67,975.87

    (j)    Amount to amortize in the final year: (i) x Table Column II value for (g) years    $97,588.15

    (k)    Quarterly payment: (d) ÷ 4    $33,866.00

    (l)    Adjusted monthly payment: (k)/2.98201    $11,356.77

    (m)    Full quarters to pay in final year: (j) ÷ (k)    2

---

\*    The average contribution base units for 2000 through 2004 was based on the average in 1997 and 1998 of 84,665 hours of contributions.

Recon
Page 4 of 7

| | | | |
|---|---|---|---|
| (n) | Amount to pay in final quarter: (j) - [(k) x (m)] | | $29,856.15 |
| (o) | Full monthly payments in final quarter:  (n)/(l) | | 2 |
| (p) | Number of full monthly payments: [12 x (g)] + [3 x (m)] + (o) | | 68 |
| (q) | Final payment | | $7,298.29 |

Employer pays:

$11,356.77 per month for 68 months plus a final payment of $7,298.29.

Recon
Page 5 of 7

## FACTOR TABLE

| Number of years | COLUMN I<br><br>Present value<br>of $1 per year<br><br>For withdrawals<br>during 2005 | COLUMN II<br><br>Accumulation<br>of $1<br><br>For withdrawals<br>during 2005 |
|---|---|---|
| 0 | 0.000000 | 1.000000 |
| 1 | 1.000000 | 1.075000 |
| 2 | 1.930233 | 1.155625 |
| 3 | 2.795565 | 1.242297 |
| 4 | 3.600526 | 1.335469 |
| 5 | 4.349326 | 1.435629 |
| 6 | 5.045885 | 1.543302 |
| 7 | 5.693846 | 1.659049 |
| 8 | 6.296601 | 1.783478 |
| 9 | 6.857304 | 1.917239 |
| 10 | 7.378887 | 2.061032 |
| 11 | 7.864081 | 2.215609 |
| 12 | 8.315424 | 2.381780 |
| 13 | 8.735278 | 2.560413 |
| 14 | 9.125840 | 2.752444 |
| 15 | 9.489154 | 2.958877 |
| 16 | 9.827120 | 3.180793 |
| 17 | 10.141507 | 3.419353 |
| 18 | 10.433960 | 3.675804 |
| 19 | 10.706009 | 3.951489 |
| 20 | 10.959078 | 4.247851 |
| Interest rate | 7.5% | 7.5% |

Recon
Page 6 of 7

## ACTUARIAL ASSUMPTIONS AND METHODS
## FOR WITHDRAWAL LIABILITY PURPOSES

**Investment return:**

(a)    To the extent vested benefits are matched by the market value of plan assets on hand:  interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Part 4044 for terminating single-employer plans which are in effect for the applicable withdrawal liability valuation date plus 1.00%.  This 1.00% adjustment reflects our studies which suggest that adjustments are necessary to reflect actual rates available on non-participating annuity contracts for pension plans.

|  | **2004** |
|---|---|
| Select rate for the first n years | 4.80% |
| Select period | 20 years |
| Ultimate rate | 6.00% |

(b)    To the extent the vested benefits are not matched by plan assets (at market): the interest assumption used for plan funding, which was 7.50% as of December 31, 2004.

(c)    The portion of the vested benefits that is matched by assets is determined by comparing the total present value of vested benefits — at adjusted PBGC rates — with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits.

## Mortality

Healthy:        1983 Group Annuity Mortality Table

Disabled:        1983 RRB Disabled Annuitants Mortality Table, set back two years

## Administrative Expenses

No separate administrative expense charge except for that portion of the vested benefits that is matched by assets.  For that portion, an expense load equal to that prescribed in Appendix C to PBGC Reg. Part 4044 based on the adjusted PBGC interest rates is used.

Recon
Page 7 of 7

**Retirement rates**

| Age | Retirement Probability (%) |
|-----|---------------------------|
| 55 – 56 | 2 |
| 57 – 59 | 5 |
| 60 – 61 | 15 |
| 62 | 45 |
| 63 | 35 |
| 64 | 25 |
| 65 | 45 |
| 66 – 70 | 30 |
| 71 & older | 100 |

Note: The above rates are applicable to active participants. Inactive participants are assumed to retire at age 60.

**Assets**

Valued at fair market value as reported in the Plan's audited financial statements.

**Unknowns**

Participants, whose age and/or service is unknown, are assumed to have same age and/or service distribution as for corresponding group of participants for whom the data are known.

**Allocation Method**

The Plan uses the presumptive method under PBGC Regulation Part 4211.32 required for construction industry plans in allocating withdrawal liability for funds that merge with other multiemployer funds. The Trustees have adopted the alternative rules detailed in PBGC Regulation Part 4211.36(b) and (d)(1). These alternative rules allow the Plan to restart its "initial plan year" liabilities. In light of the fact that a merger occurred in 2003, the initial plan year liability has been restarted as of December 31, 2004.

EXHIBIT 6



FILED
CLERK, U.S. DISTRICT COURT

SEP 2 0 2006

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

Priority ✓
Send
Enter
Closed
JS-5/JS-6      ✓
JS-2/JS-3
Scan Only

ENTERED
CLERK, U.S. DISTRICT COURT

SEP 2 1 2006

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS, AFL-CIO, an unincorporated association, | CV 00-6676 SVW (Mcx) |
| Plaintiff, | ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT WITHOUT PREJUDICE [61] |
| v. | |
| RECON REFRACTORY & CONSTRUCTION, INC., et al., | |
| Defendants. | |

DOCKETED ON CM

SEP 2 1 2006

BY _____ 003

I. INTRODUCTION

This dispute was precipitated by an employer's decision to take work previously performed by one union's members (at the Arco Refinery in Carson, California), and to assign it to another union. For years, defendant Recon Refractory & Construction Inc. ("Recon") painted the disagreement between itself and plaintiff, International Union of Bricklayers and Allied Craftworkers ("Bricklayers" or "Plaintiff"), as "jurisdictional." Recon adopted this position because it sought National Labor Relations Board ("NLRB") intervention – through what is

1  known as a "Section 10(k) proceeding." Bricklayers' local entity
2  ("Local No. 4"), which represented those union members adversely
3  impacted by Recon's actions, argued that the NLRB could not resolve
4  the dispute because it "involves a work preservation claim." See 339
5  N.L.R.B. 825 (2003). Thus, Local No. 4 strongly disagreed with
6  Recon's claim that the dispute was jurisdictional.

7      However, times have changed. In order to avoid arbitration,
8  Bricklayers now takes a position clearly inconsistent with Local No.
9  4's prior argument - arguing that this controversy must be defined as
10  a "classic" work assignment jurisdictional dispute. Not to be
11  outdone, Recon responds that the claims are obviously not
12  jurisdictional.

13      This action was originally filed on June 21, 2000. Shortly
14  thereafter, this Court received notice that a related action was
15  pending before the NLRB. This Court stayed the proceedings and placed
16  the matter on its inactive calendar in September 2000.

17      On May 1, 2006, Bricklayers asked this Court to restore the
18  instant litigation to its active calendar. This Court granted
19  Bricklayers' motion on July 31, 2006. On August 14, 2006, Bricklayers
20  filed a first amended complaint ("FAC") against Recon and two
21  individual defendants, alleging a breach of the parties' collective
22  bargaining agreement. Subsequently, Recon filed this motion to
23  dismiss Plaintiff's FAC.[1]

24

25  _____
    [1] The two individual defendants have since been joined to
26  this motion. Plaintiff does not contest this joinder, in part
    because the "individual defendants are alleged to be Recon's
27  alter egos." (Pl. Opp. at 1.) Thus, this Court's Order applies
    equally to all defendants.
28

1    For the reasons discussed below, this Court GRANTS Defendants'

2  Rule 12 motion to dismiss Plaintiff's FAC WITHOUT prejudice.

3  Plaintiff has failed to exhaust its contractual remedies under the NRA

4  Agreement.  Plaintiff is GRANTED leave to amend its FAC to compel

5  arbitration.

6

7  II.  **FACTS**

8    Bricklayers and Recon signed a collective bargaining agreement

9  entitled "Bricklayers' National Agreement for Refractory Construction"

10 (herein referred to as "the NRA Agreement").  The parties first signed

11 the NRA Agreement in 1990, and the most recent version was effective

12 from December 20, 1999, through December 20, 2003.  In 1996, Recon

13 also entered into a collective bargaining agreement with Industrial,

14 Professional and Technical Workers International Union ("IPTW").  As

15 to IPTW's collective bargaining agreement, Recon was given discretion

16 over what work to assign to its members.

17    The NLRB found, after an exhaustive eighteen days of hearings,

18 that the Bricklayers' union members had performed the disputed work

19 for a decade leading up to January 2000.  The work was then assigned

20 by Recon to IPTW.  Evidence was presented indicating that Robert

21 Bellamy, one of the individual defendants in this lawsuit, took this

22 action to gain leverage with Bricklayers.  Beginning in January 2000,

23 Bricklayers filed a grievance with Recon.

24    There are several provisions of the NRA Agreement that are

25 relevant and are therefore quoted below.  Plaintiff contends that its

26 claim is a work assignment jurisdictional dispute.  Article II(c) of

27 the NRA Agreement states that "[t]he Employer agrees to assign to

28

3

1  employees represented by the [Bricklayers] all work which has been
2  historically or traditionally assigned to [its] members." (FAC at
3  2.) Consequently, Article II(e) provides: "[i]f a jurisdictional
4  dispute arises over an assignment of work by the Employer and it
5  cannot be resolved at the local level, it shall be referred to the
6  General Presidents of the disputing Unions for resolution." (Id. at
7  3.) Notably, jurisdictional disputes do not require binding
8  arbitration.

9      Article XIV governs "Preservation of Work." This section exists
10 "to protect and preserve . . . all work heretofore performed by" the
11 union's members. It further provides that "the handling of grievances
12 and the final binding resolution of [such] disputes" will be decided
13 under the NRA Agreement's Article XII grievance process.

14     Article XII of the NRA Agreement governs "any controversy . . .
15 other than a jurisdictional dispute over the assignment of work."
16 (Id. at 12.) The grievance procedure under this Article is set out in
17 significant detail, and must be initiated within five (5) working days
18 of the alleged violation:

19
20     Step 1. The grievance shall be referred to the jobsite Local
21     Union steward and to the Employer's representative at the jobsite
22     for settlement.

23
24     Step 2. If the grievance cannot be settled within twenty-four
25     hours pursuant to Step 1 of this procedure, the grievance shall
26     be referred on the following working day to the applicable Local
27     Union Business Manager and to the Employer's representative.

28                                    4

Step 3.  If the grievance cannot be settled pursuant to Step 2 of this procedure within three (3) working days, excluding weekends and holidays, the grievance shall be submitted within two (2) working days to the International Union which shall attempt to resolve the matter with the Employer.

Step 4.  If the matter is not resolved by the International Union and the Employer, the dispute <u>will</u> be submitted to the International Masonry Institute Disputes Settlement Plan for resolution under the Plan's operating procedures referred to in Article XI of this Agreement.  <u>The decision reached</u> in accordance with the Plan's procedures <u>shall be binding</u> upon all parties. . .

F. It is <u>expressly understood</u> by the parties hereto <u>that the procedure for the settlement of grievances set out in this Article is exclusive and supersedes</u> any other plan, method or procedure.

(Id. at 12-13 (emphasis added).)  Both sides agree that the parties completed steps 1, 2, and 3 of the Article XII grievance process.  For reasons not entirely clear, Step 4 of this grievance process was never started, and instead this current litigation is pending before this Court.

///

///

///

III. DISCUSSION

   A.   The Procedure for Resolving a Purported Failure to Exhaust

   Defendants request that this Court dismiss Plaintiff's FAC under an unenumerated Rule 12 motion for failure to exhaust its contractual remedies, as specified by the NRA Agreement.  The Ninth Circuit has held that "failure to exhaust nonjudicial remedies should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment."  Ritza v. Int'l Longshoremen's & Warehousemen's Union, 837 F.2d 365, 368-69 (9th Cir. 1988).  It "is a matter in abatement, not going to the merits of the claim."  Id. at 368.

   Additionally, in rendering its decision, this Court may resolve factual disputes.  Id. at 369.  It is also clear that this Court can consider facts not explicitly mentioned in the pleadings.  See id. at 368..

   B.   Article XII Governs this Dispute and Binding Arbitration is Mandatory

        1.   This is a Work Preservation Dispute Covered by Article XII

   The Supreme Court has held that Section 301 of the Labor Management Relations Act provides a source of substantive federal common law, pursuant to which lawsuits under this section are to be resolved.  Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456-57 (1957) ("It is uncommon for federal courts to fashion federal law where federal rights are involved.  Congress has indicated by s 301(a) the purpose to follow that course here.") (internal citations omitted).  Consequently, the federal courts have developed the rule

6

1   that "[i]n labor contracts with arbitration clauses, the presumption

2   of arbitrability is very strong." <u>Dennis L. Christenson Gen'l Bldg.</u>

3   <u>Contractor v. S. Cal. Conf.</u>, 952 F.2d 1073, 1076 (9th Cir. 1991).

4      It is extremely rare that a district court has such a vast record

5   of findings of fact and conclusions of law to consider in interpreting

6   the precise collective bargaining agreement before it.  After this

7   litigation was placed on the Court's inactive calendar in 2000, the

8   NLRB proceeded to hold eighteen days of hearings on the nature of this

9   dispute.  Further, the NLRB's decision was appealed to the Ninth

10   Circuit, which affirmed the NLRB's holding in a detailed published

11   decision.  <u>See generally</u> <u>Recon Refractory & Constr. Inc. v. NLRB</u>, 424

12   F.3d 980 (9th Cir. 2005).

13      Plaintiff argues that the Ninth Circuit and NLRB's holdings are

14   very narrow and do not explicitly interpret the collective bargaining

15   agreement.  Plaintiff writes the following in a footnote to its

16   opposition:

17      The NLRB and Ninth Circuit did not interpret or consider NRA

18      Articles II(E) or XII and did not make any finding that could

19      undermine the conclusion that this dispute (although not suitable

20      for resolution under Section 10(k)) is a jurisdictional work

21      assignment dispute within the meaning of the parties' contract.

22   (Def. Opp. at 4-5 n.4.)  Plaintiff's argument that Article II(e)'s use

23   of the term "jurisdictional" is broader than its interpretation under

24   NLRB's Section 10(k) might theoretically be plausible in another

25   context.  However, the NLRB and Ninth Circuit went much further in

26   their assessment of this dispute than Plaintiff represents to this

27   Court.

28

The Ninth Circuit began its opinion by stating, "[t]he dispute at issue is fundamentally a work-preservation dispute between Recon and Bricklayers, not an inter-union jurisdictional dispute between the Bricklayers and the IPTW." Recon Refractory, 424 F.3d at 982. The Ninth Circuit also quoted the NLRB as stating that this case involves "a true work preservation dispute." Id. at 985 (quoting 339 N.L.R.B. 825). The NLRB further opined that the "real nature of the dispute was a contractual one between the Bricklayers and Recon over the preservation of bargaining unit work for the union that had traditionally performed it." Id. at 987. In even greater detail, the NLRB held, "[w]here a dispute is fundamentally one between an employer and a union, and concerns the unions' attempt merely to preserve the work it previously had performed, the Board will not afford the employer the use of a 10(k) proceeding to resolve a dispute of its own making." Id. at 987 (quoting 339 N.L.R.B. 825) (emphasis added).

The Ninth Circuit affirmed all of these findings and conclusions of law. As a result, Plaintiff cannot contend that the Ninth Circuit and NLRB limited their analysis to whether this dispute was "jurisdictional" under the 10(k) proceeding. Additionally, Plaintiff makes no serious argument as to why the term "jurisdictional dispute" means something different in the NLRB context compared to Article XII. Section 10(k) proceedings, and the applicable federal law, predate the NRA Agreements. If the parties had intended the meanings of "work preservation" and "jurisdictional disputes" to be different from what is provided under federal law, this Court believes that the parties would have explicitly indicated their intent in the collective bargaining agreement.

8

1    More importantly, the NLRB and the Ninth Circuit have

2 unambiguously held that the core of the dispute between these parties

3 can only be termed as "work preservation." Article XIV of the NRA

4 Agreement states that Article XII governs work preservation

5 grievances. Plaintiff simply proffers no feasible basis for

6 explaining how this case can be considered a jurisdictional dispute

7 when the NLRB and Ninth Circuit have decisively held to the contrary

8    The NLRB's determination that this case involves "work

9 preservation" under federal law is entitled to "considerable

10 deference." USCP-WESCO, Inc. v. NLRB, 827 F.2d 581, 583 (9th Cir.

11 1987). Because the Ninth Circuit affirmed this holding last year,

12 this Court believes the NLRB's interpretation of federal law was

13 properly supported. And because this Court has been provided no basis

14 for distinguishing between the NLRB's understanding of "work

15 preservation" under federal law, and the use of the term found in

16 Article XIV of the NRA Agreement, this Court further holds that this

17 case involves a work preservation dispute under the NRA Agreement.

18 This Court is further inclined to adopt this position because of the

19 policy favoring arbitration.[2] Plaintiff has utterly failed to meet

20 the heavy "burden of demonstrating how the language in the collective

21 bargaining agreement excludes a particular dispute from arbitration."

22 Phoenix Newspapers, Inc. v. Phoenix Mailers Union Local 752, 989 F.2d

23 1077, 1080 (9th Cir. 1993).

24

25

26    [2] As explained below, work preservation disputes must
ultimately be resolved by binding arbitration, while a
27 jurisdictional dispute does not.

28                                    9

1    Therefore, Article XII is the appropriate grievance mechanism for

2  this work preservation dispute.  Because the parties have not yet

3  entered Step 4, Plaintiff has failed to exhaust its contractual

4  remedies.

5        2.    Article XII's Binding Arbitration Procedure is Plainly

6              Mandatory

7    Plaintiff asserts that Article XII does not require binding

8  arbitration.  Step 4 of Article XII provides that if Steps 1 through 3

9  fail, "the dispute will be submitted to the International Masonry

10  Institute Disputes Settlement Plan for resolution under the Plan's

11  operating procedures."  (FAC Ex. A at 12 (emphasis added).)  Plaintiff

12  quotes the International Masonry Institute's ("IMI") plan, which

13  "makes available to the disputing parties either mediation or

14  arbitration."  (O'Connor Decl. Ex. A at 3.)  Plaintiff places

15  particular emphasis on the use of the word "either" to argue that the

16  IMI does not make arbitration mandatory, but permits the parties to

17  mutually agree to that course of action.

18    However, Plaintiff ignores that the NRA Agreement has already

19  made that choice.  Article XII(a) provides that all non-jurisdictional

20  disputes "shall be settled in accordance with the grievance procedure

21  set forth in this Article."  (FAC Ex. A at 12 (emphasis added).)

22  Article XII(f) additionally notes that "[i]t is expressly understood

23  by the parties hereto that the procedure for the settlement of

24  grievances set out in this Article is exclusive and supersedes any

25  other plan, method or procedure."

26    This Court believes that Recon and Bricklayers have the option of

27  choosing mediation or binding arbitration when Step 4 commences.

28                              10

1  However, it is also clear that if mediation fails, then binding

2  arbitration must follow.  Otherwise, Article XII would not actually be

3  the "exclusive" remedy that the parties intended it to be.

4

5  C.    Plaintiff's Defenses All Fail

6      1.    Judicial Estoppel

7  Since judicial estoppel "is intended to protect the integrity of

8  the judicial process, it is an equitable doctrine invoked by a court

9  at its discretion." Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir.

10  1990). Additionally, it has been noted that "'[e]quitable' in this

11  context refers more to fairness than to the technical distinction

12  between law and equity." In re An-Tze Chang, 308 B.R. 448, 459 (B.A.P

13  9th Cir. 2004).

14  The Ninth Circuit has further explained judicial estoppel's

15  purpose: "[t]he doctrine of judicial estoppel, sometimes referred to

16  as the doctrine of preclusion of inconsistent positions, is invoked to

17  prevent a party from changing its position over the course of judicial

18  proceedings when such positional changes have an adverse impact on the

19  judicial process." Russell, 893 F.2d at 1037 (quoting Religious Tech.

20  Ctr. v. Scott, 869 F.2d 1306, 1311 (9th Cir. 1989) (Hall, J.,

21  dissenting)); see also Stevens Tech. Servs., Inc. v. S.S. Brooklyn,

22  885 F.2d 584, 588 (9th Cir. 1989) ("Judicial estoppel precludes a

23  party from asserting a position in a current legal proceeding which is

24  contrary to the position that party previously asserted in another.").

25  The Supreme Court has recently established the basic parameters

26  of judicial estoppel. See New Hampshire v. Maine, 532 U.S. 742

27  (2001). There are three factors that this Court has been explicitly

28

11

1  permitted to consider: 1) whether Plaintiff's prior position was

2  "clearly inconsistent" with its current position, 2) "whether the

3  party has succeeded in persuading a court to accept that party's

4  earlier position," and 3) "whether the party seeking to assert an

5  inconsistent position would derive an unfair advantage or impose an

6  unfair detriment on the opposing party if not estopped." Id. at 750-

7  51.

8      The Court does not believe that the second element has been met

9  in this case. Recon previously argued to the NLRB and the Ninth

10  Circuit that this dispute was jurisdictional in nature. That view was

11  roundly rejected at each stage. Consequently, this Court declines to

12  invoke judicial estoppel in this case.

13          2.   Equitable Estoppel

14      Equitable estoppel exists as a doctrine to "preclude[] a party

15  from claiming the benefits of a contract while simultaneously

16  attempting to avoid the burdens that contracts imposes." Comer v.

17  Micor, Inc., 436 F.3d 1098, 1101 (9th Cir. 2006). This doctrine

18  requires the presence of four elements:

19          (1) the party to be estopped knows the facts, (2) he or she

20          intends that his or her conduct will be acted on or must so act

21          that the party invoking estoppel has a right to believe it is so

22          intended, (3) the party invoking estoppel must be ignorant of the

23          true facts, and (4) he or she must detrimentally rely on the

24          former's conduct.

25  United States v. Hemmen, 51 F.3d 883, 892 (9th Cir. 1995). Plaintiff

26  contends that it was unaware of the "true fact[]" that Recon would

27  ultimately reverse its legal opinion regarding the applicability of

28                                    12

1  the Article XII grievance procedure.  However, this Court believes

2  that this "fact" is likely outside the scope of the doctrine.

3      First, Recon's prior position has no bearing on whether

4  Bricklayers was unaware of the vital underlying facts necessary to

5  determine if Article XII should apply.  Indeed, it appears from the

6  very beginning that Bricklayers was cognizant of all the pertinent

7  facts related to this dispute.

8      Second, it is worth noting that Bricklayers' local branch, Local

9  No. 4, argued to the NLRB that this controversy involves a work

10  preservation dispute.[3]  Bricklayers also at least raised the issue of

11  work preservation under Article XIV in 2000.  Bricklayers has made no

12  showing how it detrimentally relied on Recon because of some fact or

13  facts that Recon kept hidden from it, or because of Recon's prior

14  legal position.  Rather, one might infer that Bricklayers has flip-

15  flopped the position taken by Local No. 4 for tactical reasons - to

16  avoid the specter of binding arbitration.

17      While this Court is not convinced that equitable estoppel should

18  apply to the facts of this case, this issue may ultimately be decided

19  by the arbitrator.  The Ninth Circuit has held that the district

20  court's "inquiry ends upon determining that the dispute is subject to

21  arbitration. . . . Even matters that are 'extrinsic' to the process of

22  interpreting the collective bargaining agreement, such as defenses of

23  collateral estoppel and equitable estoppel, are subject to

24

25      [3] It is unclear from the NLRB's decision whether Bricklayers
also explicitly adopted Local No. 4's position (in front of the
26  NLRB) that this is a work preservation dispute.  However, this
Court has little reason to believe that Bricklayers would have
27  taken a legal position contrary to that of its local branch.

28                                    13

1 arbitration." <u>Local Union No. 370 v. Morrison-Knudsen Co.</u>, 786 F.2d

2 1356, 1358 (9th Cir. 1986). As a result, the parties can make their

3 arguments related to equitable before the IMI.

4       <u>3.</u>  <u>Futility</u>

5     The doctrine of futility is similarly unavailing. Generally,

6 "[a]n employee must first exhaust or attempt to exhaust the grievance

7 and arbitration remedies provided in a collective bargaining agreement

8 before filing a suit based on that contract." <u>Hill v. Ralphs Grocery</u>

9 <u>Co.</u>, 896 F. Supp. 1492, 1502 (C.D. Cal. 1995). There are

10 circumstances in which the exhaustion requirement may be excused as

11 futile. However, this case does not fit within the accepted

12 exceptions.

13     For example, Plaintiff's claim of futility would probably succeed

14 if Recon was the only party empowered to invoke Step 4 of Article XII.

15 <u>See</u> <u>Vaca v. Sipes</u>, 386 U.S. 171, 185 (1967). Where one party is

16 literally denied the choice of exhausting all contractual remedies, it

17 would be futile for such a party to pursue those remedies any further.

18 However, from this Court's reading of the collective bargaining

19 agreement, there is simply no language barring Bricklayers from

20 proceeding to Step 4 on its own accord.

21     Additionally, Plaintiff has not alleged that the IMI would be

22 biased, or is otherwise beholden to Recon. <u>See</u> <u>Carr v. Pac. Maritime</u>

23 <u>Ass'n</u>, 904 F.2d 1313, 1317 (9th Cir. 1990). There is no evidence that

24 Recon controls the IMI's membership.

25     Because Article XII can fairly be interpreted as permitting

26 Bricklayers to unilaterally submit its grievance to the IMI, and since

27 Plaintiff has not questioned its neutrality, Plaintiff's futility

28                                       14

1  argument fails.  This Court has found no reason why the IMI would be

2  unable to satisfactorily resolve this dispute.  The mere fact that

3  Recon claimed that Article XII was inapplicable does not suffice.

4  　　　　4.  Repudiation

5  　　Plaintiff's repudiation defense also has no merit.  In Sidhu v.

6  The Fletco Co., 279 F.3d 896 (9th Cir. 2002), a union repeatedly

7  demanded that an employer enter into arbitration in accordance with a

8  collective bargaining agreement after denying an employee's grievance.

9  Id. at 898.  The Ninth Circuit ultimately held that the employer's

10 explicit refusal to arbitrate constituted a repudiation of the

11 contractual remedies, thereby excusing plaintiff's failure to exhaust.

12 　　It is true that Recon stated on multiple occasions that

13 Bricklayers' Article XII argument was "frivolous."  (O'Connor Decl.

14 Exs. B, C.).  However, such preliminary wrangling as to the legal

15 application of Article XII does not rise to the level of a refusal to

16 arbitrate - explicitly or implicitly.  It is impossible to know

17 whether Recon would have repudiated the arbitration provision under

18 Article XII because Bricklayers never initiated Step 4 proceedings.

19 　　Consequently, Plaintiff's repudiation defense is of no avail.

20

21 　　D.  Dismissal Without Prejudice

22 　　Recon claims that this case should be dismissed with prejudice

23 because Bricklayers cannot initiate binding arbitration after

24 abandoning the process six years ago.  First, this Court is cognizant

25 of the fact that five years of the six year delay is directly

26 attributable to Recon.  Recon was the party that sought the NLRB's

27

28 　　　　　　　　　　　　　　　　　15

1    intervention on a basis that the NLRB and the Ninth Circuit found to
2    be meritless.

3        Second, this Court finds an analysis of the NRA Agreement to be
4    instructive.   While the NRA Agreement contains express time limits
5    for invoking Steps 1 through 3 of Article XII, there is no such limit
6    for proceeding from Step 3 to Step 4.   If the parties had intended to
7    create self-imposed statute of limitations as to Step 4 proceedings,
8    then they were certainly capable of including such a provision in the
9    agreement.

10       Yet, the question remains whether the federal courts have imposed
11   a statute of limitations for requesting arbitration under the NRA
12   Agreement.   Section 301 of the Labor Management Relations Act
13   "contains no express statute of limitations" for compelling
14   arbitration.   Local Joint Exec. Bd. v. Exber, Inc., 994 F.2d 674, 675
15   (9th Cir. 1993).   Nonetheless, the federal courts have instituted a
16   six-month statute of limitations.

17       The Ninth Circuit has clearly held though that "the six-month
18   period begins to run from the time one party makes it clear that it
19   will not submit the matter to arbitration."   Id.   As discussed in this
20   Court's analysis of repudiation, Recon's assertion that a claim under
21   Article XII would be "frivolous" amounted only to legal jostling, and
22   did not evince a clear intent to refuse arbitration.   A party must
23   "unequivocally refuse[] a demand to arbitrate" for the statute of
24   limitations to run.   Id. (quoting Fed. of Westinghouse Indep. Salaried
25   Unions v. Westinghouse Elec. Corp., 736 F.2d 896, 902 (3d Cir. 1984)).
26   ///
27   ///
28                              16

1  This simply has not occurred.  Plaintiff never demanded arbitration by

2  failing to initiate Step 4, and Recon never refused.[4]

3      If Recon refuses to comply with Step 4 of Article XII in the

4  future, Plaintiff would have six months from that date to compel

5  arbitration under the applicable statute of limitations.

6  Consequently, this case must be dismissed without prejudice.[5]

7  ///

8  ///

9  ///

10

11

12

13

14

15

16

17

18  [4] Recon lastly refers to the "election of remedies" doctrine.  Recon
    claims that Bricklayers cannot ask this Court to compel arbitration
19  due to Bricklayers' failed attempt to seek money damages in its stead.
    This argument does not survive scrutiny.  "As the Restatement
20  provides, the doctrine of election of remedies 'applies only where a
    party pursues a remedy that he actually has.  A party is not precluded
21  from pursuing other remedies by the fact that he has made a mistaken
    attempt to obtain a remedy that is not available to him.'"  Far W.
22  Fed. Bank v. Trinity Ventures, Ltd., 119 F.3d 1358, 1366 (9th Cir.
    1997) (quoting Restatement (2d) Contracts § 378)).  Consequently,
23  Plaintiff's mistaken belief that it could pursue a claim for money
    damages in this Court does not prevent it from compelling arbitration
24  at a later date.
    [5] The Court also notes that some form of judicial review might be
25  permitted once the IMI reaches a final binding arbitration decision.
    However, "judicial review of arbitration awards is limited," and will
26  likely be upheld so long as the award "represents a plausible
    interpretation of the contract."  See Carpenters 46 N. Cal. Counties
27  Conf. Bd. v. M.L. Meddles, 535 F. Supp. 775, 778 (N.D. Cal. 1981).

28                                    17

IV.  CONCLUSION

For the foregoing reasons, this Court GRANTS Defendants' Rule 12 motion to dismiss Plaintiff's FAC WITHOUT prejudice.  Plaintiff must exhaust its contractual remedies before seeking further aid from this Court.  Plaintiff is GRANTED leave to amend its FAC to compel arbitration.

IT IS SO ORDERED.


DATED: _____9/19/06_____

_____
STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE

18