**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN J. FLYNN, et *al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) C.A. No. 06-2080 (ESH) |
| | ) |
| RECON REFRACTORY & | ) MAGISTRATE FACCIOLA |
| CONSTRUCTION, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT RECON REFRACTORY & CONSTRUCTION, INC.'S**
**SCHEDULING CONFERENCE MEMORANDUM**

Defendant Recon Refractory & Construction, Inc., by and through counsel of record,

respectfully submits this Position Statement in support of the arbitration of the matter.

I.
**BACKGROUND**

Plaintiffs are the Trustees of the Bricklayers and Trowel Trades International Pension

Fund ("IPF"), a multi-employer pension trust. Recon Refractory and Construction, Inc.

("Recon") is a Southern California based general engineering contractor.

Recon was signatory to a nationwide collective bargaining agreement with the

Bricklayers and Allied Craftworkers Union ("BAC"), known as the National Refractory

Agreement. Recon terminated its signatory status to that agreement in 2003. Under that national

agreement, signatory employers are required to comply with the wage terms of BAC's

constituent local unions' agreements in the geographical area where the signatory employer

performs work. Consequently, to determine what pension contributions are owed for any

particular hours of work performed by Recon's employees, the local union agreements' wage

terms control. A peculiarity here is that, in addition to the National Refractory Agreement,

Recon remained signatory to a single BAC local union's collective bargaining agreement in Northern California, BAC Local No. 3, until terminated the following year, 2004.

Consistent with typical construction industry collective bargaining agreement terms, contributions to the IPF are based on hours of covered work performed by Recon's employees. The actual contribution rate per hour for that work varied dramatically from 10¢ to $1.60 per hour depending upon the geographical area where the work was performed as required by that area's local union collective bargaining agreement.

By letter dated October 4, 2006, the IPF made a revised withdrawal liability demand upon Recon for $657,153.00 payable in 68 monthly installments of $11,356.77 plus a final payment of $7,298.29. The demand was sent consistent with 29 U.S.C. § 1399(b) of the Multi-Employer Pension Plan Amendments Act ("MPPAA") to the Employment Retirement Income Security Act.

Recon timely invoked the statutory dispute resolution procedures set forth at 29 U.S.C. § 1401(a), which requires mandatory arbitration of disputes. Typically, such arbitrations are conducted under the auspices of the American Arbitration Association. Here, both the IPF and Recon have determined that that forum is problematic. Accordingly, the parties have stipulated to allow this court to act as the arbitration forum pursuant to 29 U.S.C. § 1401(a)(2), and the rules of the Pension Benefit Guarantee Corporation ("PBGC") for arbitration of such withdrawal liability disputes. 29 C.F.R. Part 4221, §§ 4221.1-14.

## II.
## ISSUES TO BE ARBITRATED

Recon asserts both factual and legal matters in dispute that are properly to be litigated in this forum.

The burden of proof in this litigation is on Recon as disputing party. *See*

29 U.S.C. § 1401(a)(3)(A).

> For purposes of any proceeding under this section, any determination made by a plan sponsor under sections 1381 through 1399 of this title and section 1405 of this title is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous.

*Id*.

The methodology for calculation of the employer's withdrawal liability is set forth in 29 U.S.C. § 1391. In short, an employer's withdrawal liability is its proportional share of the Plan's unfunded vested benefits. This is the employer's contribution history, whether paid or unpaid.

Obviously, the higher the contributing employer's contribution history, the greater its proportional share of the Plan's unfunded vested benefits and hence the greater its withdrawal liability.

In a typical withdrawal liability claim, the employer's contribution history is *not* in question. Under a typical construction industry labor agreement, such as Recon's, the contributing employer must complete monthly trust fund reporting sheets and submit them to the Administrator of the various plans, *i.e.*, pension, health and welfare, vacation, apprenticeship, industry promotion, etc. On those monthly report sheets, the employer lists each employee by name, social security number, hours worked, and the contribution rate for the various plans subject to the report. Here, Recon was required throughout its signatory history to complete and transmit such monthly reports.

Occasionally, employers will fail to make required contributions. The enforcement mechanism for failure to make timely payments is through either union action for breach of the collective bargaining agreement or plan action under ERISA. BAC can strike, file grievances or commence litigation on its own merits to enforce such fringe benefit contributions. Pension

funds, like the IPF, are afforded their own litigation enforcement mechanisms under ERISA, 29

U.S.C. § 1145, to enforce compliance.

### 1.    The Contribution History Dispute

The core dispute here is that the IPF seeks to de-couple Recon's withdrawal liability from

the reality of Recon's actual hourly contribution requirement under the collective bargaining

agreement, which is referred to in the statutory language in 29 U.S.C. § 1391(a)(2), as Recon's

"obligation to contribute."[1]

In its withdrawal liability claim, however, the IPF here does not employ the statutory

covered obligation to contribute concept but rather, utilizes an "obligation to contribute"

methodology having no basis in fact or law.  This methodology is set forth in the IPF's memo to

IPF counsel dated October 2, 2006, which is attached hereto as Exhibit "1" and is identified

based on "contribution rate history" set forth in paragraph 2 of the letter exhibit.

In summary, for the years 2000 through 2004 the IPF utilizes a formula for determining

Recon's contribution history (as a proxy for its "obligation to contribute") that makes no attempt

to identify the employees' hours worked for which the IPF claims were owed, but allegedly

unpaid.  Instead, the IPF merely took Recon's known contribution history for the years 1997-

1998 and projected them forward into the years 2000-2004 as if it were fact.

The IPF will claim that this formula was "reasonable" because Recon allegedly failed to

comply with the IPF's auditing efforts.  This is a key factual dispute to be resolved in this

---

[1] 29 U.S.C. § 1392(a) defines the "obligation to contribute:"

(a) "Obligation to contribute" defined.  For purposes of this part, the term "obligation to contribute" means an obligation to contribute arising— (1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law, but does not include an obligation to pay withdrawal liability under this section or to pay delinquent contributions.

arbitration.  Recon maintains that it has been audited by IPF repeatedly and thoroughly.  Recon maintains that the IPF knows the name and social security number of every employee that has worked for Recon on any project during the period in question.

To date, the IPF has never identified a single employee that it claims was performing work for which any pension fund contributions are due and unpaid.  Similarly, the IPF has never brought litigation to enforce collection of those alleged underpayments to the IPF under Section 301 of the Labor Act, 29 U.S.C. § 185 or ERISA, 29 U.S.C. § 1132(a)(1)(3).  It may strike the Court as odd that the IPF's Trustees perceived their fiduciary duty to mandate utilization of such an extreme methodology to compute withdrawal liability but, to date, have not sought to enforce collection obligations on behalf of those employees for whom and in years when contributions have allegedly not been paid.  (The withdrawal liability payments claimed here will therefore not inure to the benefit of these unrecognized employees.)

It is black letter law that a multi-pension trust must compel pension contributions under a collective bargaining agreement on behalf of all employees that performed covered work.  Their status as union members is irrelevant.  *Central States, SE & SW Areas Pension Fund v. Central Cartage Co.*, 69 F.3d 1312 (7th Cir 1995), *cert. denied*, 517 U.S. 1134, (1996).

### 2    **Judge Wilson's Arbitration Order**.

Attached to this brief as Exhibit "2" is a copy of District Judge Steven V. Wilson's Order in the Central District of California Granting Defendants' Motion to Dismiss Plaintiff's First Amended Complaint Without Prejudice dated September 19, 2006.  Based upon Judge Wilson's Order, Recon and BAC are currently in arbitration over BAC's claim that Recon failed to comply with the National Refractory Agreement (for the same period of liability in issue in the instant proceeding).

The next hearing date in that arbitration is scheduled for July 30, 2007.  Unless that

arbitration results in a remedy that Recon owes contributions to the IPF under the National

Refractory Agreement, there is no factual or legal basis for the IPF to claim here that Recon's

"obligation to contribute" exceeds hours actually reported, paid or owed by Recon.  Perforce, the

IPF's withdrawal liability calculation incorporating its own estimated under-reported hours must

fail.

> **3.    A Stay Pending Arbitration May Be Appropriate**.

The court may wish to consider whether resolution of this arbitration should be stayed

pending the results of that arbitration ordered by Judge Wilson.  If the arbitration is concluded in

the near future, Recon is amenable to a brief stay.  If that matter drags on for reasons that cannot

yet be known, Recon offers that the "pay now dispute later" provision of the MPPAA 29 U.S.C.

§ 1401(d) represents a tremendous hardship to a contracting firm of Recon's size.  Recon

believes that if this court were to require the IPF to recalculate Recon's withdrawal liability

based on actual audited hours of covered work, rather than the IPF's "guesstimate", the

company's withdrawal liability billing would be reduced to a negligible sum.

It is Recon's position that the IPF should have submitted a withdrawal liability billing

based upon verifiable hours for which contributions were owed.  To the extent the IPF claimed

that it was incapable of ascertaining the amount of hours and covered work for which

contributions are unreported and unpaid, IPF should have begun enforcement efforts to collect

underpayments.  Armed with that judgment, it could have issued a supplemental withdrawal

liability claim incorporating these under reported hours.  The IPF is now time barred from

pursuing collection efforts for any claim of under reported hours prior to 2003 under the

applicable four year statute of limitations.

Unless the current arbitration proceedings in Los Angeles fashion an award requiring IPF

contributions covering this time barred period, there is no factual or legal support for fashioning

a withdrawal liability claim which utilizes any methodology to boot strap an "obligation to contribute" where no "obligation to contribute" exists.

The IPF will doubtless argue that the "obligation to contribute" issue falls within the ambit of "actuarial assumptions and methods" as referenced in 29 U.S.C. § 1401(a)(B). The IPF is wrong. The obligation to contribute issue was not a calculation performed by the Plan's actuaries. Instead, the contribution estimates for years 2000 through 2004 were given to the Plan's actuary by the IPF. This actuary was directed to utilize this figure as Recon's contribution history as evidenced in Exhibit 1. Accordingly, the Plan's actuary merely incorporated these numbers into his calculations. They are in no manner "actuarial assumptions and methods" for which deference is due under cited statute.

While Recon is prepared to offer expert testimony from an enrolled actuary on this issue, Recon believes that the issue is so clear that it is properly a matter for summary judgment. The entire legislative history of the MPPAA, and the plain wording of the statute, underscore that withdrawal liability is premised upon liability incurred by the Plan on behalf of participants. Here, the IPF has forsaken collection efforts of pension contributions for these unidentified participants for the extended period the Fund attempts to apply withdrawal liability here. In lieu thereof, the IPF seeks simply to take a parting shot at a withdrawing employer through this inflated withdrawal liability claim.

Even if this Court were to accept the disputed factual assertion that Recon hindered the IPF's audit of its records, the IPF may not utilize an estimate of Recon's "obligation to contribute" for withdrawal liability purposes when the underlying remedy to compel collection of those disputed hours by the Fund is now time barred. Recon suggests that that summary judgment await the arbitration proceedings scheduled in July 2007.

**4.    The Gus Sand Audit is not an Actuarial Assumption or Method Under 29 U.S.C. § 1401(a)(2)(B).**

By letter dated June 12, 2007 (post-scheduling conference), the IPF's attorney, Ira R. Mitzner, supplied Recon, for the very first time, the results of the so called "Gus Sand audit." Gus Sand is the gentleman who headed the audit team that audited Recon on behalf of the IPF. That audit result was often asked for, but never received previously.  That audit took place three (3) years ago!

Moreover, this audit report was never referenced in the IPF's documents produced in response to Recon's Request for Plan Review documents under 29 U.S.C. § 1399(b)(2)(A). Plainly, this Gus Sand audit report played no role whatsoever in the calculation of Recon's withdrawal liability.  The IPF intends, according to Attorney Mitzner, to use this so called audit to argue that the Plan's guesstimate of unreported and unpaid hours for 2000-20004 is reasonable.

On its face, the Gus Sand audit maintains that all hours worked by employees in the collective bargaining unit covered by Recon's collective bargaining agreement with the International Petroleum and Technical Workers Union ("IPTW") are covered work under the National Refractory Agreement.  There is no analysis of why the audit reaches this determination.

Recon is a general engineering contractor.  The overwhelming proportion of its work involves mechanical work, piping and controls and is totally unrelated to the rather narrow subtrade of bricklayers work covered by the BAC National Refractory Agreement.  This work is obviously outside scope of covered work under the National Refractory Agreement and work for which no contribution can be claimed by the IPF to date.  The IPF has made no attempt to enforce a claim for contributions on this work.

5.     **Discovery Involving the Gus Sand Audit is Requested**.

Because of the IPF's insertion of this Gus Sand Audit document at this late date, Recon

requests permission to take the deposition of Mr. Gus Sand and the discovery of all his audit

materials prior to any hearing in this case.

6.     **The Amortization Schedule Is Erroneous**.

Recon also challenges the amortization schedule identified by the Plan which resulted in

the staggeringly large monthly installment payments.  Recon is prepared to offer expert

testimony from an enrolled actuary that the $1.60 utilized by the actuary in calculating the

amortization schedule was unreasonable, arbitrary and capricious and contrary to law.

7.     **Hearing Schedule.**

Defendant requests at least sixty days notice to present its case.

Respectfully submitted,

RECON REFRACTORY & CONSTRUCTION,
INC.


Eugene F. McMenamin
Atkinson, Andelson, Loya, Rudd & Romo
17871 Park Plaza Drive, Suite 200
Cerritos, CA 90703-8597
Admitted *Pro Hac Vice*

By: /s/ Michael E. Avakian
MICHAEL E. AVAKIAN
Bar No. 391924
Attorney for Defendant


SMETANA & AVAKIAN
5211 Port Royal Road, Suite 610
Springfield, VA 22151
(703) 321-9181

Dated: June 29, 2007

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN J. FLYNN, et *al.*,<br><br>Plaintiffs,<br><br>v.<br><br>RECON REFRACTORY &<br>CONSTRUCTION, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)   C.A. No. 06-2080 (ESH)<br>)<br>)<br>)<br>)<br>)<br>) |

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the DEFENDANT'S DEFENDANT RECON REFRACTORY & CONSTRUCTION, INC.'S SCHEDULING CONFERENCE MEMORANDUM was served, via the Court's ECF system on this the 29th day of June 2007, to the counsel of record in the above styled case named below:

Ira R. Mitzner, Esq.
DICKSTEIN SHAPIRO LLP
1825 Eye Street N.W.
Washington, D.C.  20006-5403


<u>/s/ Michael E. Avakian</u>
Michael E. Avakian
Smetana & Avakian
5211 Port Royal Road, Suite 610
Springfield, VA 22151
(703) 321-9181

EXHIBIT 1

# M E M O R A N D U M

**FROM:**     Alan P. Cohn                                **DATE:**   October 2, 2006
            Darrin Owens

**TO:**       David Stupar, Executive Director
            Bricklayers and Trowel Trades International Pension Fund

**RE:**       **Withdrawal Liability for Recon Refractory & Construction, Inc.**


As requested, we have determined the withdrawal liability calculation for Recon Refractory & Construction, Inc. ("Recon"). Our calculations are based on information received from the Fund Office and Fund estimates of contributions for the years 2000 through 2004. The Fund provided these estimates using an annual contribution of $79,311.45 (average contributions in 1997 and 1998) starting in 2000. In addition, the payment schedule was determined by using the contribution base units of 84,665 hours (which is the average for 1997 and 1998), as provided by the Fund, for years 2000 through 2004.

Except as noted above, our calculations are based on information received from the Fund Office with respect to Recon's hours and contribution rate history (1995 – 2004) and an actual withdrawal date of February 2005. Please note that it is also our understanding that this employer is not part of a larger controlled group. We have attached the withdrawal liability calculation and the payment schedule for this liability.

All calculations were done under the supervision of Diane Gleave, ASA, FCA, MAAA, Enrolled Actuary.

Please let us know if you have any questions.

Best regards.

cc:    Ira Mitzner, Esq.


6013348v1/02073.009

EXHIBIT 2

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No.   CV 00-6676-SVW(MCx)                    Date   09-18-2006

Title   International Union of Bricklayers and Allied Craftworkers -vs- Recon Refractory &
Construction, Inc. et. al.

Present: The
Honorable          STEPHEN V. WILSON, UNITED STATES DISTRICT JUDGE

| Paul Cruz; Steve Chung | Deborah Gackle | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:          Attorneys Present for Defendants:

Jeffrey B. Demain                        Eugene McMenamin
                                         Olivia Goodkin

**Proceedings:**          DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

Hearing held.

Court takes matter under submission. Order to issue.



                                                              0    :    14

Initials of Preparer                                          SC

CV-90 (06/04)                    CIVIL MINUTES - GENERAL                    Page 1 of 1



THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).



Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS, AFL-CIO, an unincorporated association, | ) ) ) ) ) | CV 00-6676 SVW (Mcx) ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT WITHOUT PREJUDICE [61] |
| Plaintiff, | ) ) | |
| v. | ) | |
| RECON REFRACTORY & CONSTRUCTION, INC., et al., | ) ) ) | |
| Defendants. | ) ) | |
| | ) ) ) | |



I.    INTRODUCTION

This dispute was precipitated by an employer's decision to take

work previously performed by one union's members (at the Arco Refinery

in Carson, California), and to assign it to another union.  For years,

defendant Recon Refractory & Construction Inc. ("Recon") painted the

disagreement between itself and plaintiff, International Union of

Bricklayers and Allied Craftworkers ("Bricklayers" or "Plaintiff"), as

"jurisdictional."  Recon adopted this position because it sought

National Labor Relations Board ("NLRB") intervention - through what is

known as a "Section 10(k) proceeding." Bricklayers' local entity ("Local No. 4"), which represented those union members adversely impacted by Recon's actions, argued that the NLRB could not resolve the dispute because it "involves a work preservation claim."  See 339 N.L.R.B. 825 (2003).  Thus, Local No. 4 strongly disagreed with Recon's claim that the dispute was jurisdictional.

However, times have changed.  In order to avoid arbitration, Bricklayers now takes a position clearly inconsistent with Local No. 4's prior argument - arguing that this controversy must be defined as a "classic" work assignment jurisdictional dispute.  Not to be outdone, Recon responds that the claims are obviously not jurisdictional.

This action was originally filed on June 21, 2000.  Shortly thereafter, this Court received notice that a related action was pending before the NLRB.  This Court stayed the proceedings and placed the matter on its inactive calendar in September 2000.

On May 1, 2006, Bricklayers asked this Court to restore the instant litigation to its active calendar.  This Court granted Bricklayers' motion on July 31, 2006.  On August 14, 2006, Bricklayers filed a first amended complaint ("FAC") against Recon and two individual defendants, alleging a breach of the parties' collective bargaining agreement.  Subsequently, Recon filed this motion to dismiss Plaintiff's FAC.[1]

_____

[1] The two individual defendants have since been joined to this motion.  Plaintiff does not contest this joinder, in part because the "individual defendants are alleged to be Recon's alter egos." (Pl. Opp. at 1.)  Thus, this Court's Order applies equally to all defendants.

1  For the reasons discussed below, this Court GRANTS Defendants'

2  Rule 12 motion to dismiss Plaintiff's FAC WITHOUT prejudice.

3  Plaintiff has failed to exhaust its contractual remedies under the NRA

4  Agreement.  Plaintiff is GRANTED leave to amend its FAC to compel

5  arbitration.

6

7  II.   FACTS

8  Bricklayers and Recon signed a collective bargaining agreement

9  entitled "Bricklayers' National Agreement for Refractory Construction"

10 (herein referred to as "the NRA Agreement").  The parties first signed

11 the NRA Agreement in 1990, and the most recent version was effective

12 from December 20, 1999, through December 20, 2003.  In 1996, Recon

13 also entered into a collective bargaining agreement with Industrial,

14 Professional and Technical Workers International Union ("IPTW").  As

15 to IPTW's collective bargaining agreement, Recon was given discretion

16 over what work to assign to its members.

17 The NLRB found, after an exhaustive eighteen days of hearings,

18 that the Bricklayers' union members had performed the disputed work

19 for a decade leading up to January 2000.  The work was then assigned

20 by Recon to IPTW.  Evidence was presented indicating that Robert

21 Bellamy, one of the individual defendants in this lawsuit, took this

22 action to gain leverage with Bricklayers.  Beginning in January 2000,

23 Bricklayers filed a grievance with Recon.

24 There are several provisions of the NRA Agreement that are

25 relevant and are therefore quoted below.  Plaintiff contends that its

26 claim is a work assignment jurisdictional dispute.  Article II(c) of

27 the NRA Agreement states that "[t]he Employer agrees to assign to

28

3

1   employees represented by the [Bricklayers] all work which has been
2   historically or traditionally assigned to [its] members." (FAC at
3   2.) Consequently, Article II(e) provides: "[i]f a jurisdictional
4   dispute arises over an assignment of work by the Employer and it
5   cannot be resolved at the local level, it shall be referred to the
6   General Presidents of the disputing Unions for resolution." (Id. at
7   3.) Notably, jurisdictional disputes do not require binding
8   arbitration.

9        Article XIV governs "Preservation of Work." This section exists
10  "to protect and preserve . . . all work heretofore performed by" the
11  union's members. It further provides that "the handling of grievances
12  and the final binding resolution of [such] disputes" will be decided
13  under the NRA Agreement's Article XII grievance process.

14       Article XII of the NRA Agreement governs "any controversy . . .
15  other than a jurisdictional dispute over the assignment of work."
16  (Id. at 12.) The grievance procedure under this Article is set out in
17  significant detail, and must be initiated within five (5) working days
18  of the alleged violation:

19

20       Step 1. The grievance shall be referred to the jobsite Local
21       Union steward and to the Employer's representative at the jobsite
22       for settlement.

23

24       Step 2. If the grievance cannot be settled within twenty-four
25       hours pursuant to Step 1 of this procedure, the grievance shall
26       be referred on the following working day to the applicable Local
27       Union Business Manager and to the Employer's representative.

28                                       4

Step 3.  If the grievance cannot be settled pursuant to Step 2 of this procedure within three (3) working days, excluding weekends and holidays, the grievance shall be submitted within two (2) working days to the International Union which shall attempt to resolve the matter with the Employer.

Step 4.  If the matter is not resolved by the International Union and the Employer, the dispute _will_ be submitted to the International Masonry Institute Disputes Settlement Plan for resolution under the Plan's operating procedures referred to in Article XI of this Agreement.  _The decision reached_ in accordance with the Plan's procedures _shall be binding_ upon all parties. . .

F. It is _expressly understood_ by the parties hereto _that the procedure for the settlement of grievances set out in this Article is exclusive and supersedes_ any other plan, method or procedure.

(Id. at 12-13 (emphasis added).)  Both sides agree that the parties completed steps 1, 2, and 3 of the Article XII grievance process.  For reasons not entirely clear, Step 4 of this grievance process was never started, and instead this current litigation is pending before this Court.

///

///

///

5

1   III. DISCUSSION

2     A.   The Procedure for Resolving a Purported Failure to Exhaust

3     Defendants request that this Court dismiss Plaintiff's FAC under

4 an unenumerated Rule 12 motion for failure to exhaust its contractual

5 remedies, as specified by the NRA Agreement. The Ninth Circuit has

6 held that "failure to exhaust nonjudicial remedies should be raised in

7 a motion to dismiss, or be treated as such if raised in a motion for

8 summary judgment." Ritza v. Int'l Longshoremen's & Warehousemen's

9 Union, 837 F.2d 365, 368-69 (9th Cir. 1988). It "is a matter in

10 abatement, not going to the merits of the claim." Id. at 368.

11     Additionally, in rendering its decision, this Court may resolve

12 factual disputes. Id. at 369. It is also clear that this Court can

13 consider facts not explicitly mentioned in the pleadings. See id. at

14 368.

15

16     B.   Article XII Governs this Dispute and Binding Arbitration is

17        Mandatory

18        1.   This is a Work Preservation Dispute Covered by Article

19           XII

20     The Supreme Court has held that Section 301 of the Labor

21 Management Relations Act provides a source of substantive federal

22 common law, pursuant to which lawsuits under this section are to be

23 resolved. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456-

24 57 (1957) ("It is uncommon for federal courts to fashion federal law

25 where federal rights are involved. Congress has indicated by s 301(a)

26 the purpose to follow that course here.") (internal citations

27 omitted). Consequently, the federal courts have developed the rule

28                         6

1  that "[i]n labor contracts with arbitration clauses, the presumption

2  of arbitrability is very strong." <u>Dennis L. Christenson Gen'l Bldg.</u>

3  <u>Contractor v. S. Cal. Conf.</u>, 952 F.2d 1073, 1076 (9th Cir. 1991).

4       It is extremely rare that a district court has such a vast record

5  of findings of fact and conclusions of law to consider in interpreting

6  the precise collective bargaining agreement before it.  After this

7  litigation was placed on the Court's inactive calendar in 2000, the

8  NLRB proceeded to hold eighteen days of hearings on the nature of this

9  dispute.  Further, the NLRB's decision was appealed to the Ninth

10  Circuit, which affirmed the NLRB's holding in a detailed published

11  decision.  <u>See generally</u> <u>Recon Refractory & Constr. Inc. v. NLRB</u>, 424

12  F.3d 980 (9th Cir. 2005).

13       Plaintiff argues that the Ninth Circuit and NLRB's holdings are

14  very narrow and do not explicitly interpret the collective bargaining

15  agreement.  Plaintiff writes the following in a footnote to its

16  opposition:

17       The NLRB and Ninth Circuit did not interpret or consider NRA

18       Articles II(E) or XII and did not make any finding that could

19       undermine the conclusion that this dispute (although not suitable

20       for resolution under Section 10(k)) is a jurisdictional work

21       assignment dispute within the meaning of the parties' contract.

22  (Def. Opp. at 4-5 n.4.)  Plaintiff's argument that Article II(e)'s use

23  of the term "jurisdictional" is broader than its interpretation under

24  NLRB's Section 10(k) might theoretically be plausible in another

25  context.  However, the NLRB and Ninth Circuit went much further in

26  their assessment of this dispute than Plaintiff represents to this

27  Court.

28                                        7

1    The Ninth Circuit began its opinion by stating, "[t]he dispute at

2  issue is fundamentally a work-preservation dispute between Recon and

3  Bricklayers, not an inter-union jurisdictional dispute between the

4  Bricklayers and the IPTW." Recon Refractory, 424 F.3d at 982.  The

5  Ninth Circuit also quoted the NLRB as stating that this case involves

6  "a true work preservation dispute." Id. at 985 (quoting 339 N.L.R.B.

7  825).  The NLRB further opined that the "real nature of the dispute

8  was a contractual one between the Bricklayers and Recon over the

9  preservation of bargaining unit work for the union that had

10  traditionally performed it." Id. at 987.  In even greater detail, the

11  NLRB held, "[w]here a dispute is fundamentally one between an employer

12  and a union, and concerns the unions' attempt merely to preserve the

13  work it previously had performed, the Board will not afford the

14  employer the use of a 10(k) proceeding to resolve a dispute of its own

15  making." Id. at 987 (quoting 339 N.L.R.B. 825) (emphasis added).

16    The Ninth Circuit affirmed all of these findings and conclusions

17  of law.  As a result, Plaintiff cannot contend that the Ninth Circuit

18  and NLRB limited their analysis to whether this dispute was

19  "jurisdictional" under the 10(k) proceeding.  Additionally, Plaintiff

20  makes no serious argument as to why the term "jurisdictional dispute"

21  means something different in the NLRB context compared to Article XII.

22  Section 10(k) proceedings, and the applicable federal law, predate the

23  NRA Agreements.  If the parties had intended the meanings of "work

24  preservation" and "jurisdictional disputes" to be different from what

25  is provided under federal law, this Court believes that the parties

26  would have explicitly indicated their intent in the collective

27  bargaining agreement.

28                                        8

1   More importantly, the NLRB and the Ninth Circuit have

2   unambiguously held that the core of the dispute between these parties

3   can only be termed as "work preservation."  Article XIV of the NRA

4   Agreement states that Article XII governs work preservation

5   grievances.  Plaintiff simply proffers no feasible basis for

6   explaining how this case can be considered a jurisdictional dispute

7   when the NLRB and Ninth Circuit have decisively held to the contrary.

8   The NLRB's determination that this case involves "work

9   preservation" under federal law is entitled to "considerable

10  deference."  USCP-WESCO, Inc. v. NLRB, 827 F.2d 581, 583 (9th Cir.

11  1987).  Because the Ninth Circuit affirmed this holding last year,

12  this Court believes the NLRB's interpretation of federal law was

13  properly supported.  And because this Court has been provided no basis

14  for distinguishing between the NLRB's understanding of "work

15  preservation" under federal law, and the use of the term found in

16  Article XIV of the NRA Agreement, this Court further holds that this

17  case involves a work preservation dispute under the NRA Agreement.

18  This Court is further inclined to adopt this position because of the

19  policy favoring arbitration.[2]  Plaintiff has utterly failed to meet

20  the heavy "burden of demonstrating how the language in the collective

21  bargaining agreement excludes a particular dispute from arbitration."

22  Phoenix Newspapers, Inc. v. Phoenix Mailers Union Local 752, 989 F.2d

23  1077, 1080 (9th Cir. 1993).

24

25

26  [2] As explained below, work preservation disputes must
    ultimately be resolved by binding arbitration, while a
27  jurisdictional dispute does not.

28                                9

1    Therefore, Article XII is the appropriate grievance mechanism for

2  this work preservation dispute.  Because the parties have not yet

3  entered Step 4, Plaintiff has failed to exhaust its contractual

4  remedies.

5        2.    Article XII's Binding Arbitration Procedure is Plainly

6              Mandatory

7    Plaintiff asserts that Article XII does not require binding

8  arbitration.  Step 4 of Article XII provides that if Steps 1 through 3

9  fail, "the dispute will be submitted to the International Masonry

10  Institute Disputes Settlement Plan for resolution under the Plan's

11  operating procedures."  (FAC Ex. A at 12 (emphasis added).)  Plaintiff

12  quotes the International Masonry Institute's ("IMI") plan, which

13  "makes available to the disputing parties either mediation or

14  arbitration."  (O'Connor Decl. Ex. A at 3.)  Plaintiff places

15  particular emphasis on the use of the word "either" to argue that the

16  IMI does not make arbitration mandatory, but permits the parties to

17  mutually agree to that course of action.

18    However, Plaintiff ignores that the NRA Agreement has already

19  made that choice.  Article XII(a) provides that all non-jurisdictional

20  disputes "shall be settled in accordance with the grievance procedure

21  set forth in this Article."  (FAC Ex. A at 12 (emphasis added).)

22  Article XII(f) additionally notes that "[i]t is expressly understood

23  by the parties hereto that the procedure for the settlement of

24  grievances set out in this Article is exclusive and supersedes any

25  other plan, method or procedure."

26    This Court believes that Recon and Bricklayers have the option of

27  choosing mediation or binding arbitration when Step 4 commences.

28                                10

1  However, it is also clear that if mediation fails, then binding

2  arbitration must follow.  Otherwise, Article XII would not actually be

3  the "exclusive" remedy that the parties intended it to be.

4

5      C.    Plaintiff's Defenses All Fail

6          1.    Judicial Estoppel

7      Since judicial estoppel "is intended to protect the integrity of

8  the judicial process, it is an equitable doctrine invoked by a court

9  at its discretion."  Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir.

10  1990).  Additionally, it has been noted that "'[e]quitable' in this

11  context refers more to fairness than to the technical distinction

12  between law and equity."  In re An-Tze Chang, 308 B.R. 448, 459 (B.A.P

13  9th Cir. 2004).

14      The Ninth Circuit has further explained judicial estoppel's

15  purpose: "[t]he doctrine of judicial estoppel, sometimes referred to

16  as the doctrine of preclusion of inconsistent positions, is invoked to

17  prevent a party from changing its position over the course of judicial

18  proceedings when such positional changes have an adverse impact on the

19  judicial process."  Russell, 893 F.2d at 1037 (quoting Religious Tech.

20  Ctr. v. Scott, 869 F.2d 1306, 1311 (9th Cir. 1989) (Hall, J.,

21  dissenting)); see also Stevens Tech. Servs., Inc. v. S.S. Brooklyn,

22  885 F.2d 584, 588 (9th Cir. 1989) ("Judicial estoppel precludes a

23  party from asserting a position in a current legal proceeding which is

24  contrary to the position that party previously asserted in another.").

25      The Supreme Court has recently established the basic parameters

26  of judicial estoppel.  See New Hampshire v. Maine, 532 U.S. 742

27  (2001).  There are three factors that this Court has been explicitly

28                                    11

1   permitted to consider: 1) whether Plaintiff's prior position was
2   "clearly inconsistent" with its current position, 2) "whether the
3   party has succeeded in persuading a court to accept that party's
4   earlier position," and 3) "whether the party seeking to assert an
5   inconsistent position would derive an unfair advantage or impose an
6   unfair detriment on the opposing party if not estopped." Id. at 750-
7   51.

8       The Court does not believe that the second element has been met
9   in this case.  Recon previously argued to the NLRB and the Ninth
10  Circuit that this dispute was jurisdictional in nature.  That view was
11  roundly rejected at each stage.  Consequently, this Court declines to
12  invoke judicial estoppel in this case.

13      2.   Equitable Estoppel
14      Equitable estoppel exists as a doctrine to "preclude[] a party
15  from claiming the benefits of a contract while simultaneously
16  attempting to avoid the burdens that contracts imposes.." Comer v.
17  Micor, Inc., 436 F.3d 1098, 1101 (9th Cir. 2006).  This doctrine
18  requires the presence of four elements:

19      (1) the party to be estopped knows the facts, (2) he or she
20      intends that his or her conduct will be acted on or must so act
21      that the party invoking estoppel has a right to believe it is so
22      intended, (3) the party invoking estoppel must be ignorant of the
23      true facts, and (4) he or she must detrimentally rely on the
24      former's conduct.

25  United States v. Hemmen, 51 F.3d 883, 892 (9th Cir. 1995).  Plaintiff
26  contends that it was unaware of the "true fact[]" that Recon would
27  ultimately reverse its legal opinion regarding the applicability of

28                                    12

1  the Article XII grievance procedure.  However, this Court believes

2  that this "fact" is likely outside the scope of the doctrine.

3      First, Recon's prior position has no bearing on whether

4  Bricklayers was unaware of the vital underlying facts necessary to

5  determine if Article XII should apply.  Indeed, it appears from the

6  very beginning that Bricklayers was cognizant of all the pertinent

7  facts related to this dispute.

8      Second, it is worth noting that Bricklayers' local branch, Local

9  No. 4, argued to the NLRB that this controversy involves a work

10 preservation dispute.[3]  Bricklayers also at least raised the issue of

11 work preservation under Article XIV in 2000.  Bricklayers has made no

12 showing how it detrimentally relied on Recon because of some fact or

13 facts that Recon kept hidden from it, or because of Recon's prior

14 legal position.  Rather, one might infer that Bricklayers has flip-

15 flopped the position taken by Local No. 4 for tactical reasons - to

16 avoid the specter of binding arbitration.

17     While this Court is not convinced that equitable estoppel should

18 apply to the facts of this case, this issue may ultimately be decided

19 by the arbitrator.  The Ninth Circuit has held that the district

20 court's "inquiry ends upon determining that the dispute is subject to

21 arbitration. . . . Even matters that are 'extrinsic' to the process of

22 interpreting the collective bargaining agreement, such as defenses of

23 collateral estoppel and equitable estoppel, are subject to

24

25     [3] It is unclear from the NLRB's decision whether Bricklayers
   also explicitly adopted Local No. 4's position (in front of the
26 NLRB) that this is a work preservation dispute.  However, this
   Court has little reason to believe that Bricklayers would have
27 taken a legal position contrary to that of its local branch.

28                              13

1  arbitration." <u>Local Union No. 370 v. Morrison-Knudsen Co.</u>, 786 F.2d

2  1356, 1358 (9th Cir. 1986). As a result, the parties can make their

3  arguments related to equitable before the IMI.

        3.  <u>Futility</u>

5      The doctrine of futility is similarly unavailing. Generally,

6  "[a]n employee must first exhaust or attempt to exhaust the grievance

7  and arbitration remedies provided in a collective bargaining agreement

8  before filing a suit based on that contract." <u>Hill v. Ralphs Grocery

9  Co.</u>, 896 F. Supp. 1492, 1502 (C.D. Cal. 1995). There are

10 circumstances in which the exhaustion requirement may be excused as

11 futile. However, this case does not fit within the accepted

12 exceptions.

13     For example, Plaintiff's claim of futility would probably succeed

14 if Recon was the only party empowered to invoke Step 4 of Article XII.

15 <u>See Vaca v. Sipes</u>, 386 U.S. 171, 185 (1967). Where one party is

16 literally denied the choice of exhausting all contractual remedies, it

17 would be futile for such a party to pursue those remedies any further.

18 However, from this Court's reading of the collective bargaining

19 agreement, there is simply no language barring Bricklayers from

20 proceeding to Step 4 on its own accord.

21     Additionally, Plaintiff has not alleged that the IMI would be

22 biased, or is otherwise beholden to Recon. <u>See Carr v. Pac. Maritime

23 Ass'n</u>, 904 F.2d 1313, 1317 (9th Cir. 1990). There is no evidence that

24 Recon controls the IMI's membership.

25     Because Article XII can fairly be interpreted as permitting

26 Bricklayers to unilaterally submit its grievance to the IMI, and since

27 Plaintiff has not questioned its neutrality, Plaintiff's futility

28                                 14

1  argument fails.  This Court has found no reason why the IMI would be

2  unable to satisfactorily resolve this dispute.  The mere fact that

3  Recon claimed that Article XII was inapplicable does not suffice.

4          4.  Repudiation

5      Plaintiff's repudiation defense also has no merit.  In Sidhu v.

6  The Fletco Co., 279 F.3d 896 (9th Cir. 2002), a union repeatedly

7  demanded that an employer enter into arbitration in accordance with a

8  collective bargaining agreement after denying an employee's grievance.

9  Id. at 898.  The Ninth Circuit ultimately held that the employer's

10  explicit refusal to arbitrate constituted a repudiation of the

11  contractual remedies, thereby excusing plaintiff's failure to exhaust.

12      It is true that Recon stated on multiple occasions that

13  Bricklayers' Article XII argument was "frivolous."  (O'Connor Decl.

14  Exs. B, C.).  However, such preliminary wrangling as to the legal

15  application of Article XII does not rise to the level of a refusal to

16  arbitrate - explicitly or implicitly.  It is impossible to know

17  whether Recon would have repudiated the arbitration provision under

18  Article XII because Bricklayers never initiated Step 4 proceedings.

19      Consequently, Plaintiff's repudiation defense is of no avail.

20

21      D.  Dismissal Without Prejudice

22      Recon claims that this case should be dismissed with prejudice

23  because Bricklayers cannot initiate binding arbitration after

24  abandoning the process six years ago.  First, this Court is cognizant

25  of the fact that five years of the six year delay is directly

26  attributable to Recon.  Recon was the party that sought the NLRB's

27

28                                  15

1   intervention on a basis that the NLRB and the Ninth Circuit found to

2   be meritless.

3       Second, this Court finds an analysis of the NRA Agreement to be

4   instructive.   While the NRA Agreement contains express time limits

5   for invoking Steps 1 through 3 of Article XII, there is no such limit

6   for proceeding from Step 3 to Step 4.   If the parties had intended to

7   create self-imposed statute of limitations as to Step 4 proceedings,

8   then they were certainly capable of including such a provision in the

9   agreement.

10      Yet, the question remains whether the federal courts have imposed

11  a statute of limitations for requesting arbitration under the NRA

12  Agreement.   Section 301 of the Labor Management Relations Act

13  "contains no express statute of limitations" for compelling

14  arbitration.   Local Joint Exec. Bd. v. Exber, Inc., 994 F.2d 674, 675

15  (9th Cir. 1993).   Nonetheless, the federal courts have instituted a

16  six-month statute of limitations.

17      The Ninth Circuit has clearly held though that "the six-month

18  period begins to run from the time one party makes it clear that it

19  will not submit the matter to arbitration."   Id.  As discussed in this

20  Court's analysis of repudiation, Recon's assertion that a claim under

21  Article XII would be "frivolous" amounted only to legal jostling, and

22  did not evince a clear intent to refuse arbitration.   A party must

23  "unequivocally refuse[] a demand to arbitrate" for the statute of

24  limitations to run.   Id. (quoting Fed. of Westinghouse Indep. Salaried

25  Unions v. Westinghouse Elec. Corp., 736 F.2d 896, 902 (3d Cir. 1984)).

26  ///

27  ///

28                                  16

1   This simply has not occurred.  Plaintiff never demanded arbitration by

2   failing to initiate Step 4, and Recon never refused.[4]

3        If Recon refuses to comply with Step 4 of Article XII in the

4   future, Plaintiff would have six months from that date to compel

5   arbitration under the applicable statute of limitations.

6   Consequently, this case must be dismissed without prejudice.[5]

7   ///

8   ///

9   ///

10

11

12

13

14

15

16

17

18   [4] Recon lastly refers to the "election of remedies" doctrine.  Recon
     claims that Bricklayers cannot ask this Court to compel arbitration
19   due to Bricklayers' failed attempt to seek money damages in its stead.
     This argument does not survive scrutiny.  "As the Restatement
20   provides, the doctrine of election of remedies 'applies only where a
     party pursues a remedy that he actually has.  A party is not precluded
21   from pursuing other remedies by the fact that he has made a mistaken
     attempt to obtain a remedy that is not available to him.'"  Far W.
22   Fed. Bank v. Trinity Ventures, Ltd., 119 F.3d 1358, 1366 (9th Cir.
     1997) (quoting Restatement (2d) Contracts § 378)).  Consequently,
23   Plaintiff's mistaken belief that it could pursue a claim for money
     damages in this Court does not prevent it from compelling arbitration
24   at a later date.

25   [5]  The Court also notes that some form of judicial review might be
     permitted once the IMI reaches a final binding arbitration decision.
26   However, "judicial review of arbitration awards is limited," and will
     likely be upheld so long as the award "represents a plausible
27   interpretation of the contract."  See Carpenters 46 N. Cal. Counties
     Conf. Bd. v. M.L. Meddles, 535 F. Supp. 775, 778 (N.D. Cal. 1981).

28                                    17

IV.   CONCLUSION

For the foregoing reasons, this Court GRANTS Defendants' Rule 12 motion to dismiss Plaintiff's FAC WITHOUT prejudice.   Plaintiff must exhaust its contractual remedies before seeking further aid from this Court.   Plaintiff is GRANTED leave to amend its FAC to compel arbitration.

IT IS SO ORDERED.

DATED: ____9/19/06____

_____
STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV00-6676-SVW(Mcx) | Date | September 20, 2006 |

| | |
|---|---|
| Title | International Union of Bricklayers and Allied Craftworkers, et al., vs. Recon Refractory & Construction, Inc. |

Present: The Honorable  STEPHEN V. WILSON, U.S. DISTRICT JUDGE

| Paul M. Cruz | N/A | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:          Attorneys Present for Defendants:

N/A                                    N/A

**Proceedings:**        IN CHAMBERS ORDER re INACTIVE STATUS

Having GRANTED Defendants' motion to dismiss WITHOUT prejudice, in an Order signed September 19, 2006, this Court places this litigation on its inactive calendar.



Initials of Preparer